# VIETH ET AL. *v.* JUBELIRER, PRESIDENT OF THE PENNSYLVANIA SENATE, ET AL.

No. 02–1580. Argued December 10, 2003—Decided April 28, 2004

268

*Paul M. Smith* argued the cause for appellants. With him on the briefs were *Thomas J. Perrelli, Bruce V. Spiva, Sam Hirsch, Daniel Mach,* and *Robert B. Hoffman.*

*John P. Krill, Jr.,* argued the cause for appellee Jubelirer et al. With him on the brief were *Linda J. Shorey* and *Julia M. Glencer. J. Bart DeLone,* Senior Deputy Attorney General of Pennsylvania, argued the cause for appellee Cortés et al. With him on the brief were *D. Michael Fisher,* Attorney General, and *John G. Knorr III,* Chief Deputy Attorney General.\*

JUSTICE SCALIA announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE THOMAS join.

Plaintiffs-appellants Richard Vieth, Norma Jean Vieth, and Susan Furey challenge a map drawn by the Pennsylvania General Assembly establishing districts for the election of congressional Representatives, on the ground that the districting constitutes an unconstitutional political gerrymander.[1] In *Davis* v. *Bandemer,* 478 U. S. 109 (1986), this Court held that political gerrymandering claims are justiciable, but

---

\*Briefs of *amici curiae* urging reversal were filed for the Texas House Democratic Caucus et al. by *J. Gerald Hebert* and *Pamela S. Karlan;* for the American Civil Liberties Union et al. by *Burt Neuborne, Deborah Goldberg, J. J. Gass, Steven R. Shapiro, Arthur N. Eisenberg, Laughlin McDonald,* and *Neil Bradley;* for Public Citizen et al. by *Alan B. Morrison, Amanda Frost,* and *Scott Nelson;* for the Reform Institute et al. by *Daniel R. Ortiz* and *Trevor Potter;* for JoAnn Erfer et al. by *Einer Elhauge;* and for Pennsylvania State Senator Robert J. Mellow by *Gladys M. Brown.*

Briefs of *amici curiae* were filed for Alabama State Senator Lowell Barron et al. by *James U. Blacksher* and *Robert D. Segall;* for the Center for Research into Governmental Processes, Inc., by *Jamin B. Raskin;* for the DKT Liberty Project by *Scott A. Sinder;* for Bernard Grofman et al. by *H. Reed Witherby;* and for Jack N. Rakove et al. by *Joseph R. Guerra* and *Stephen B. Kinnaird.*

[1] The term "political gerrymander" has been defined as "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." Black's Law Dictionary 696 (7th ed. 1999).

could not agree upon a standard to adjudicate them. The present appeal presents the questions whether our decision in *Bandemer* was in error, and, if not, what the standard should be.

I

The facts, as alleged by the plaintiffs, are as follows. The population figures derived from the 2000 census showed that Pennsylvania was entitled to only 19 Representatives in Congress, a decrease in 2 from the Commonwealth's previous delegation. Pennsylvania's General Assembly took up the task of drawing a new districting map. At the time, the Republican Party controlled a majority of both state Houses and held the Governor's office. Prominent national figures in the Republican Party pressured the General Assembly to adopt a partisan redistricting plan as a punitive measure against Democrats for having enacted pro-Democrat redistricting plans elsewhere. The Republican members of Pennsylvania's House and Senate worked together on such a plan. On January 3, 2002, the General Assembly passed its plan, which was signed into law by Governor Schweiker as Act 1.

Plaintiffs, registered Democrats who vote in Pennsylvania, brought suit in the United States District Court for the Middle District of Pennsylvania, seeking to enjoin implementation of Act 1 under Rev. Stat. § 1979, 42 U. S. C. § 1983. Defendants-appellees were the Commonwealth of Pennsylvania and various executive and legislative officers responsible for enacting or implementing Act 1. The complaint alleged, among other things, that the legislation created malapportioned districts, in violation of the one-person, one-vote requirement of Article I, § 2, of the United States Constitution, and that it constituted a political gerrymander, in violation of Article I and the Equal Protection Clause of the Fourteenth Amendment. With regard to the latter contention, the complaint alleged that the districts created by Act 1 were "meandering and irregular," and "ignor[ed] all traditional redistricting criteria, including the preservation of

local government boundaries, solely for the sake of partisan advantage." Juris. Statement 136a, ¶ 22, 135a, ¶ 20.

A three-judge panel was convened pursuant to 28 U. S. C. § 2284. The defendants moved to dismiss. The District Court granted the motion with respect to the political gerrymandering claim, and (on Eleventh Amendment grounds) all claims against the Commonwealth; but it declined to dismiss the apportionment claim as to other defendants. See *Vieth* v. *Pennsylvania*, 188 F. Supp. 2d 532 (MD Pa. 2002) *(Vieth I)*. On trial of the apportionment claim, the District Court ruled in favor of plaintiffs. See *Vieth* v. *Pennsylvania*, 195 F. Supp. 2d 672 (MD Pa. 2002) *(Vieth II)*. It retained jurisdiction over the case pending the court's review and approval of a remedial redistricting plan. On April 18, 2002, Governor Schweiker signed into law Act No. 2002–34, Pa. Stat. Ann., Tit. 25, § 3595.301 (Purdon Supp. 2003) (Act 34), a remedial plan that the Pennsylvania General Assembly had enacted to cure the apportionment problem of Act 1.

Plaintiffs moved to impose remedial districts, arguing that the District Court should not consider Act 34 to be a proper remedial scheme, both because it was malapportioned, and because it constituted an unconstitutional political gerrymander like its predecessor. The District Court denied this motion, concluding that the new districts were not malapportioned, and rejecting the political gerrymandering claim for the reasons previously assigned in *Vieth I*. *Vieth* v. *Pennsylvania*, 241 F. Supp. 2d 478, 484–485 (MD Pa. 2003) *(Vieth III)*. The plaintiffs appealed the dismissal of their Act 34 political gerrymandering claim.[2] We noted probable jurisdiction. 539 U. S. 957 (2003).

---

[2] The plaintiffs apparently never amended their complaint to allege that Act 34 was a political gerrymander, yet the District Court's decision in *Vieth III* resolved that claim on the merits. Because subject-matter jurisdiction is not implicated and neither party has raised the point, we assume that the District Court deemed the plaintiffs' original complaint to have been constructively amended.

274

## II

Political gerrymanders are not new to the American scene. One scholar traces them back to the Colony of Pennsylvania at the beginning of the 18th century, where several counties conspired to minimize the political power of the city of Philadelphia by refusing to allow it to merge or expand into surrounding jurisdictions, and denying it additional representatives. See E. Griffith, The Rise and Development of the Gerrymander 26–28 (1974) (hereinafter Griffith). In 1732, two members of His Majesty's Council and the attorney general and deputy inspector and comptroller general of affairs of the Province of North Carolina reported that the Governor had proceeded to "divide old Precincts established by Law, & to enact new Ones in Places, whereby his Arts he has endeavoured to prepossess People in a future election according to his desire, his Designs herein being . . . either to endeavour by his means to get a Majority of his creatures in the Lower House" or to disrupt the assembly's proceedings. 3 Colonial Records of North Carolina 380–381 (W. Saunders ed. 1886); see also Griffith 29. The political gerrymander remained alive and well (though not yet known by that name) at the time of the framing. There were allegations that Patrick Henry attempted (unsuccessfully) to gerrymander James Madison out of the First Congress. See 2 W. Rives, Life and Times of James Madison 655, n. 1 (reprint 1970); Letter from Thomas Jefferson to William Short, Feb. 9, 1789, reprinted in 5 Works of Thomas Jefferson 451 (P. Ford ed. 1904). And in 1812, of course, there occurred the notoriously outrageous political districting in Massachusetts that gave the gerrymander its name—an amalgam of the names of Massachusetts Governor Elbridge Gerry and the creature ("salamander") which the outline of an election district he was credited with forming was thought to resemble. See Webster's New International Dictionary 1052 (2d ed. 1945). "By 1840 the gerrymander was a recognized force in party politics and was generally attempted in all legislation

enacted for the formation of election districts. It was generally conceded that each party would attempt to gain power which was not proportionate to its numerical strength." Griffith 123.

It is significant that the Framers provided a remedy for such practices in the Constitution. Article I, § 4, while leaving in state legislatures the initial power to draw districts for federal elections, permitted Congress to "make or alter" those districts if it wished.[3] Many objected to the congressional oversight established by this provision. In the course of the debates in the Constitutional Convention, Charles Pinckney and John Rutledge moved to strike the relevant language. James Madison responded in defense of the provision that Congress must be given the power to check partisan manipulation of the election process by the States:

> "Whenever the State Legislatures had a favorite measure to carry, they would take care so to mould their regulations as to favor the candidates they wished to succeed. Besides, the inequality of the Representation in the Legislatures of particular States, would produce a like inequality in their representation in the Natl. Legislature, as it was presumable that the Counties having the power in the former case would secure it to themselves in the latter. What danger could there be in giving a controuling power to the Natl. Legislature?" 2 Records of the Federal Convention of 1787, pp. 240–241 (M. Farrand ed. 1911).

Although the motion of Pinckney and Rutledge failed, opposition to the "make or alter" provision of Article I, § 4—and the defense that it was needed to prevent political gerryman-

---

[3] Article I, § 4, provides as follows:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

dering—continued to be voiced in the state ratifying debates. A delegate to the Massachusetts convention warned that state legislatures

> "might make an unequal and partial division of the states into districts for the election of representatives, or they might even disqualify one third of the electors. Without these powers in Congress, the people can have no remedy; but the 4th section provides a remedy, a controlling power in a legislature, composed of senators and representatives of twelve states, without the influence of our commotions and factions, who will hear impartially, and preserve and restore to the people their equal and sacred rights of election." 2 Debates on the Federal Constitution 27 (J. Elliot 2d ed. 1876).

The power bestowed on Congress to regulate elections, and in particular to restrain the practice of political gerrymandering, has not lain dormant. In the Apportionment Act of 1842, 5 Stat. 491, Congress provided that Representatives must be elected from single-member districts "composed of contiguous territory." See Griffith 12 (noting that the law was "an attempt to forbid the practice of the gerrymander"). Congress again imposed these requirements in the Apportionment Act of 1862, 12 Stat. 572, and in 1872 further required that districts "contai[n] as nearly as practicable an equal number of inhabitants," 17 Stat. 28, § 2. In the Apportionment Act of 1901, Congress imposed a compactness requirement. 31 Stat. 733. The requirements of contiguity, compactness, and equality of population were repeated in the 1911 apportionment legislation, 37 Stat. 13, but were not thereafter continued. Today, only the single-member-district-requirement remains. See 2 U. S. C. § 2c. Recent history, however, attests to Congress's awareness of the sort of districting practices appellants protest, and of its power under Article I, § 4, to control them. Since 1980, no fewer than five bills have been introduced to regulate gerry-

mandering in congressional districting. See H. R. 5037, 101st Cong., 2d Sess. (1990); H. R. 1711, 101st Cong., 1st Sess. (1989); H. R. 3468, 98th Cong., 1st Sess. (1983); H. R. 5529, 97th Cong., 2d Sess. (1982); H. R. 2349, 97th Cong., 1st Sess. (1981).[4]

Eighteen years ago, we held that the Equal Protection Clause grants judges the power—and duty—to control political gerrymandering, see *Davis* v. *Bandemer*, 478 U. S. 109 (1986). It is to consideration of this precedent that we now turn.

## III

As Chief Justice Marshall proclaimed two centuries ago, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). Sometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights. See, *e. g., Nixon* v. *United States*, 506 U. S. 224 (1993) (challenge to procedures used in Senate impeachment proceedings); *Pacific States Telephone & Telegraph Co.* v. *Oregon*, 223 U. S. 118 (1912) (claims arising under the Guaranty Clause of Article IV, §4). Such questions are said to be "nonjusticiable," or "political questions."

In *Baker* v. *Carr*, 369 U. S. 186 (1962), we set forth six independent tests for the existence of a political question:

"[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable stand-

---

[4] The States, of course, have taken their own steps to prevent abusive districting practices. A number have adopted standards for redistricting, and measures designed to insulate the process from politics. See, *e. g.,* Iowa Code § 42.4(5) (2003); N. J. Const., Art. II, § 2; Haw. Rev. Stat. § 25–2 (1993); Idaho Code § 72–1506 (1948–1999); Me. Rev. Stat. Ann., Tit. 21–A, §§ 1206, 1206–A (West Supp. 2003); Mont. Code Ann. § 5–1–115 (2003); Wash. Rev. Code § 44.05.090 (1994).

ards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.*, at 217.

These tests are probably listed in descending order of both importance and certainty. The second is at issue here, and there is no doubt of its validity. "The judicial Power" created by Article III, §1, of the Constitution is not *whatever* judges choose to do, see *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 487 (1982); cf. *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 332–333 (1999), or even *whatever* Congress chooses to assign them, see *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 576–577 (1992); *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 110–114 (1948). It is the power to act in the manner traditional for English and American courts. One of the most obvious limitations imposed by that requirement is that judicial action must be governed by *standard*, by *rule*. Laws promulgated by the Legislative Branch can be inconsistent, illogical, and ad hoc; law pronounced by the courts must be principled, rational, and based upon reasoned distinctions.

Over the dissent of three Justices, the Court held in *Davis* v. *Bandemer* that, since it was "not persuaded that there are no judicially discernible and manageable standards by which political gerrymander cases are to be decided," 478 U. S., at 123, such cases *were* justiciable. The clumsy shifting of the burden of proof for the premise (the Court was "not persuaded" that standards do not exist, rather than "persuaded"

that they do) was necessitated by the uncomfortable fact that the six-Justice majority could not discern what the judicially discernable standards might be. There was no majority on that point. Four of the Justices finding justiciability believed that the standard was one thing, see *id.*, at 127 (plurality opinion of White, J., joined by Brennan, Marshall, and Blackmun, JJ.); two believed it was something else, see *id.*, at 161 (Powell, J., joined by STEVENS, J., concurring in part and dissenting in part). The lower courts have lived with that assurance of a standard (or more precisely, lack of assurance that there is no standard), coupled with that inability to specify a standard, for the past 18 years. In that time, they have considered numerous political gerrymandering claims; this Court has never revisited the unanswered question of what standard governs.

Nor can it be said that the lower courts have, over 18 years, succeeded in shaping the standard that this Court was initially unable to enunciate. They have simply applied the standard set forth in *Bandemer*'s four-Justice plurality opinion. This might be thought to prove that the four-Justice plurality standard has met the test of time—but for the fact that its application has almost invariably produced the same result (except for the incurring of attorney's fees) as would have obtained if the question were nonjusticiable: Judicial intervention has been refused. As one commentary has put it, "[t]hroughout its subsequent history, *Bandemer* has served almost exclusively as an invitation to litigation without much prospect of redress." S. Issacharoff, P. Karlan, & R. Pildes, The Law of Democracy 886 (rev. 2d ed. 2002). The one case in which relief was provided (and merely preliminary relief, at that) did *not* involve the drawing of district lines;[5] in *all* of the cases we are aware of involving that most

---

[5] See *Republican Party of North Carolina v. Martin*, 980 F. 2d 943 (CA4 1992) (upholding denial of Federal Rule of Civil Procedure 12(b)(6) judgment for the defendants); *Republican Party of North Carolina v. North Carolina State Bd. of Elections*, 27 F. 3d 563 (CA4 1994) (unpublished

common form of political gerrymandering, relief was denied.[6] Moreover, although the case in which relief was provided seemingly involved the *ne plus ultra* of partisan manipulation, see n. 5, *supra,* we would be at a loss to explain why the *Bandemer* line should have been drawn just there, and should not have embraced several districting plans that were upheld despite allegations of extreme partisan discrimina-

---

opinion) (upholding, as modified, a preliminary injunction). *Martin* dealt with North Carolina's system of electing superior court judges statewide, a system that had resulted in the election of only a single Republican judge since 1900. 980 F. 2d, at 948. Later developments in the case are described in n. 8, *infra.*

[6] For cases in which courts rejected prayers for relief under *Davis* v. *Bandemer,* 478 U. S. 109 (1986), see, *e. g., Duckworth* v. *State Administrative Bd. of Election Laws,* 332 F. 3d 769 (CA4 2003); *Smith* v. *Boyle,* 144 F. 3d 1060 (CA7 1998); *La Porte County Republican Central Comm.* v. *Board of Comm'rs of County of La Porte,* 43 F. 3d 1126 (CA7 1994); *Session* v. *Perry,* 298 F. Supp. 2d 451 (ED Tex. 2004) *(per curiam); Martinez* v. *Bush,* 234 F. Supp. 2d 1275 (SD Fla. 2002) (three-judge panel); *O'Lear* v. *Miller,* 222 F. Supp. 2d 850 (ED Mich.), summarily aff'd, 537 U. S. 997 (2002); *Marylanders for Fair Representation, Inc.* v. *Schaefer,* 849 F. Supp. 1022 (Md. 1994) (three-judge panel); *Terrazas* v. *Slagle,* 821 F. Supp. 1162 (WD Tex. 1993) (three-judge panel); *Pope* v. *Blue,* 809 F. Supp. 392 (WDNC) (three-judge panel), summarily aff'd, 506 U. S. 801 (1992); *Illinois Legislative Redistricting Comm'n* v. *LaPaille,* 782 F. Supp. 1272 (ND Ill. 1992); *Fund for Accurate and Informed Representation, Inc.* v. *Weprin,* 796 F. Supp. 662 (NDNY) (three-judge panel), summarily aff'd, 506 U. S. 1017 (1992); *Holloway* v. *Hechler,* 817 F. Supp. 617 (SD W. Va. 1992) (three-judge panel), summarily aff'd, 507 U. S. 956 (1993); *Hastert* v. *State Bd. of Elections,* 777 F. Supp. 634 (ND Ill. 1991) (three-judge panel); *Anne Arundel County Republican Central Comm.* v. *State Administrative Bd. of Election Laws,* 781 F. Supp. 394 (Md. 1991) (three-judge panel), summarily aff'd, 504 U. S. 938 (1992); *Republican Party of Virginia* v. *Wilder,* 774 F. Supp. 400 (WD Va. 1991) (three-judge panel); *Badham* v. *Eu,* 694 F. Supp. 664, 670 (ND Cal. 1988), summarily aff'd, 488 U. S. 1024 (1989); *In re 2003 Legislative Apportionment of House of Representatives,* 2003 ME 81, 827 A. 2d 810; *McClure* v. *Secretary of Commonwealth,* 436 Mass. 614, 766 N. E. 2d 847 (2002); *Legislative Redistricting Cases,* 331 Md. 574, 629 A. 2d 646 (1993); *Kenai Peninsula Borough* v. *State,* 743 P. 2d 1352 (Alaska 1987).

tion, bizarrely shaped districts, and disproportionate results. See, *e. g., Session* v. *Perry,* 298 F. Supp. 2d 451 (ED Tex. 2004) *(per curiam); O'Lear* v. *Miller,* 222 F. Supp. 2d 850 (ED Mich.), summarily aff'd, 537 U. S. 997 (2002); *Badham* v. *Eu,* 694 F. Supp. 664, 670 (ND Cal. 1988), summarily aff'd, 488 U. S. 1024 (1989). To think that this lower court jurisprudence has brought forth "judicially discernible and manageable standards" would be fantasy.

Eighteen years of judicial effort with virtually nothing to show for it justify us in revisiting the question whether the standard promised by *Bandemer* exists. As the following discussion reveals, no judicially discernible and manageable standards for adjudicating political gerrymandering claims have emerged. Lacking them, we must conclude that political gerrymandering claims are nonjusticiable and that *Bandemer* was wrongly decided.

## A

We begin our review of possible standards with that proposed by Justice White's plurality opinion in *Bandemer* because, as the narrowest ground for our decision in that case, it has been the standard employed by the lower courts. The plurality concluded that a political gerrymandering claim could succeed only where plaintiffs showed "both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." 478 U. S., at 127. As to the intent element, the plurality acknowledged that "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." *Id.,* at 129. However, the effects prong was significantly harder to satisfy. Relief could not be based merely upon the fact that a group of persons banded together for political purposes had failed to achieve representation commensurate with its numbers, or that the apportionment scheme made its winning of elections more difficult. *Id.,* at 132. Rather,

it would have to be shown that, taking into account a variety of historic factors and projected election results, the group had been "denied its chance to effectively influence the political process" as a whole, which could be achieved even without electing a candidate. *Id.*, at 132–133. It would not be enough to establish, for example, that Democrats had been "placed in a district with a supermajority of other Democratic voters" or that the district "departs from pre-existing political boundaries." *Id.*, at 140–141. Rather, in a challenge to an individual district the inquiry would focus "on the opportunity of members of the group to participate in party deliberations in the slating and nomination of candidates, their opportunity to register and vote, and hence their chance to directly influence the election returns and to secure the attention of the winning candidate." *Id.*, at 133. A statewide challenge, by contrast, would involve an analysis of "the voters' direct *or indirect* influence on the elections of the state legislature as a whole." *Ibid.* (emphasis added). With what has proved to be a gross understatement, the plurality acknowledged this was "of necessity a difficult inquiry." *Id.*, at 143.

In her *Bandemer* concurrence, JUSTICE O'CONNOR predicted that the plurality's standard "will over time either prove unmanageable and arbitrary or else evolve towards some loose form of proportionality." *Id.*, at 155 (opinion concurring in judgment, joined by Burger, C. J., and REHNQUIST, J.). A similar prediction of unmanageability was expressed in Justice Powell's opinion, making it the prognostication of a majority of the Court. See *id.*, at 171 ("The . . . most basic flaw in the plurality's opinion is its failure to enunciate any standard that affords guidance to legislatures and courts"). That prognostication has been amply fulfilled.

In the lower courts, the legacy of the plurality's test is one long record of puzzlement and consternation. See, *e. g., Session, supra,* at 474 ("Throughout this case we have borne

witness to the powerful, conflicting forces nurtured by *Bandemer*'s holding that the judiciary is to address 'excessive' partisan line-drawing, while leaving the issue virtually unenforceable"); *Vieth I*, 188 F. Supp. 2d, at 544 (noting that the "recondite standard enunciated in *Bandemer* offers little concrete guidance"); *Martinez* v. *Bush*, 234 F. Supp. 2d 1275, 1352 (SD Fla. 2002) (three-judge court) (Jordan, J., concurring) (the "lower courts continue to struggle in an attempt to interpret and apply the 'discriminatory effect' prong of the *[Bandemer]* standard"); *O'Lear, supra*, at 855 (describing *Bandemer*'s standard for assessing discriminatory effect as "somewhat murky"). The test has been criticized for its indeterminacy by a host of academic commentators. See, *e. g.*, L. Tribe, American Constitutional Law § 13–9, p. 1083 (2d ed. 1988) ("Neither Justice White's nor Justice Powell's approach to the question of partisan apportionment gives any real guidance to lower courts forced to adjudicate this issue . . ."); Still, Hunting of the Gerrymander, 38 UCLA L. Rev. 1019, 1020 (1991) (noting that the plurality opinion has "confounded legislators, practitioners, and academics alike"); Schuck, The Thickest Thicket: Partisan Gerrymandering and Judicial Regulation of Politics, 87 Colum. L. Rev. 1325, 1365 (1987) (noting that the *Bandemer* plurality's standard requires judgments that are "largely subjective and beg questions that lie at the heart of political competition in a democracy"); Issacharoff, Judging Politics: The Elusive Quest for Judicial Review of Political Fairness, 71 Texas L. Rev. 1643, 1671 (1993) (*"Bandemer* begot only confusion"); Grofman, An Expert Witness Perspective on Continuing and Emerging Voting Rights Controversies, 21 Stetson L. Rev. 783, 816 (1992) ("[A]s far as I am aware I am one of only two people who believe that *Bandemer* makes sense. Moreover, the other person, Daniel Lowenstein, has a diametrically opposed view as to *what* the plurality opinion means"). Because this standard was misguided when proposed, has not been improved in subsequent application, and is not even de-

fended before us today by the appellants, we decline to affirm it as a constitutional requirement.

### B

Appellants take a run at enunciating their own workable standard based on Article I, §2, and the Equal Protection Clause. We consider it at length not only because it reflects the litigant's view as to the best that can be derived from 18 years of experience, but also because it shares many features with other proposed standards, so that what is said of it may be said of them as well. Appellants' proposed standard retains the two-pronged framework of the *Bandemer* plurality—intent plus effect—but modifies the type of showing sufficient to satisfy each.

To satisfy appellants' intent standard, a plaintiff must "show that the mapmakers acted with a *predominant intent* to achieve partisan advantage," which can be shown "by direct evidence or by circumstantial evidence that other neutral and legitimate redistricting criteria were subordinated to the goal of achieving partisan advantage." Brief for Appellants 19 (emphasis added). As compared with the *Bandemer* plurality's test of mere intent to disadvantage the plaintiff's group, this proposal seemingly makes the standard more difficult to meet—but only at the expense of making the standard more indeterminate.

"Predominant intent" to disadvantage the plaintiff's political group refers to the relative importance of that goal as compared with all the other goals that the map seeks to pursue—contiguity of districts, compactness of districts, observance of the lines of political subdivision, protection of incumbents of all parties, cohesion of natural racial and ethnic neighborhoods, compliance with requirements of the Voting Rights Act of 1965 regarding racial distribution, etc. Appellants contend that their intent test *must* be discernible and manageable because it has been borrowed from our racial gerrymandering cases. See *Miller* v. *Johnson,* 515 U. S. 900

(1995); *Shaw* v. *Reno,* 509 U. S. 630 (1993). To begin with, in a very important respect that is not so. In the racial gerrymandering context, the predominant intent test has been applied to the challenged district in which the plaintiffs voted. See *Miller, supra; United States* v. *Hays,* 515 U. S. 737 (1995). Here, however, appellants do not assert that an apportionment fails their intent test if any single district does so. Since "it would be quixotic to attempt to bar state legislatures from considering politics as they redraw district lines," Brief for Appellants 3, appellants propose a test that is satisfied only when "partisan advantage was the predominant motivation *behind the entire statewide plan,*" *id.,* at 32 (emphasis added). Vague as the "predominant motivation" test might be when used to evaluate single districts, it all but evaporates when applied statewide. Does it mean, for instance, that partisan intent must outweigh all other goals—contiguity, compactness, preservation of neighborhoods, etc.—*statewide?* And how is the statewide "outweighing" to be determined? If three-fifths of the map's districts forgo the pursuit of partisan ends in favor of strictly observing political-subdivision lines, and only two-fifths ignore those lines to disadvantage the plaintiffs, is the observance of political subdivisions the "predominant" goal between those two? We are sure appellants do not think so.

Even within the narrower compass of challenges to a single district, applying a "predominant intent" test to *racial* gerrymandering is easier and less disruptive. The Constitution clearly contemplates districting by political entities, see Article I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics. See *Miller, supra,* at 914 ("[R]edistricting in most cases will implicate a political calculus in which various interests compete for recognition . . ."); *Shaw, supra,* at 662 (White, J., dissenting) ("[D]istricting inevitably is the expression of interest group politics . . ."); *Gaffney* v. *Cummings,* 412 U. S. 735, 753 (1973) ("The reality is that districting inevitably has and is intended to have sub-

stantial political consequences"). By contrast, the purpose of segregating voters on the basis of race is not a lawful one, and is much more rarely encountered. Determining whether the shape of a particular district is so substantially affected by the presence of a rare and constitutionally suspect motive as to invalidate it is quite different from determining whether it is so substantially affected by the excess of an ordinary and lawful motive as to invalidate it. Moreover, the fact that partisan districting is a lawful and common practice means that there is almost *always* room for an election-impeding lawsuit contending that partisan advantage was the predominant motivation; not so for claims of racial gerrymandering. Finally, courts might be justified in accepting a modest degree of unmanageability to enforce a constitutional command which (like the Fourteenth Amendment obligation to refrain from racial discrimination) is clear; whereas they are not justified in inferring a judicially enforceable constitutional obligation (the obligation not to apply *too much* partisanship in districting) which is both dubious and severely unmanageable. For these reasons, to the extent that our racial gerrymandering cases represent a model of discernible and manageable standards, they provide no comfort here.

The effects prong of appellants' proposal replaces the *Bandemer* plurality's vague test of "denied its chance to effectively influence the political process," 478 U. S., at 132–133, with criteria that are seemingly more specific. The requisite effect is established when "(1) the plaintiffs show that the districts systematically 'pack' and 'crack' the rival party's voters,[7] *and* (2) the court's examination of the 'totality of circumstances' confirms that the map can thwart the plaintiffs' ability to translate a majority of votes into a majority

---

[7] "Packing" refers to the practice of filling a district with a supermajority of a given group or party. "Cracking" involves the splitting of a group or party among several districts to deny that group or party a majority in any of those districts.

of seats." Brief for Appellants 20 (emphasis and footnote added). This test is loosely based on our cases applying §2 of the Voting Rights Act of 1965, 42 U. S. C. § 1973, to discrimination by race, see, *e. g., Johnson* v. *De Grandy*, 512 U. S. 997 (1994). But a person's politics is rarely as readily discernible—and *never* as permanently discernible—as a person's race. Political affiliation is not an immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line. We dare say (and hope) that the political party which puts forward an utterly incompetent candidate will lose even in its registration stronghold. These facts make it impossible to assess the effects of partisan gerrymandering, to fashion a standard for evaluating a violation, and finally to craft a remedy. See *Bandemer, supra,* at 156 (O'CONNOR, J., concurring in judgment).[8]

Assuming, however, that the effects of partisan gerrymandering can be determined, appellants' test would invalidate the districting only when it prevents a majority of the electorate from electing a majority of representatives. Before considering whether this particular standard is judicially

---

[8] A delicious illustration of this is the one case we have found—alluded to above—that provided relief under *Bandemer.* See n. 5, *supra.* In *Republican Party of North Carolina* v. *Hunt*, No. 94–2410, 1996 WL 60439 (CA4, Feb. 12, 1996) *(per curiam)* (unpublished), judgt. order reported at 77 F. 3d 470, the District Court, after a trial with no less than 311 stipulations by the parties, 132 witness statements, approximately 300 exhibits, and 2 days of oral argument, concluded that North Carolina's system of electing superior court judges on a statewide basis "had resulted in Republican candidates experiencing a consistent and pervasive lack of success and exclusion from the electoral process as a whole and that these effects were likely to continue unabated into the future." 1996 WL 60439, at *1. In the elections for superior court judges conducted just *five days* after this pronouncement, "every Republican candidate standing for the office of superior court judge was victorious at the state level," *ibid.*, a result which the Fourth Circuit thought (with good reason) "directly at odds with the recent prediction by the district court," *id.*, at *2, causing it to remand the case for reconsideration.

manageable we question whether it is judicially discernible in the sense of being relevant to some constitutional violation. Deny it as appellants may (and do), this standard rests upon the principle that groups (or at least political-action groups) have a right to proportional representation. But the Constitution contains no such principle. It guarantees equal protection of the law to persons, not equal representation in government to equivalently sized groups. It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers.[9]

Even if the standard were relevant, however, it is not judicially manageable. To begin with, how is a party's majority status to be established? Appellants propose using the results of statewide races as the benchmark of party support. But as their own complaint describes, in the 2000 Pennsylvania statewide elections some Republicans won and some Democrats won. See Juris. Statement 137a–138a (describing how Democratic candidates received more votes for President and auditor general, and Republicans received more votes for United States Senator, attorney general, and treasurer). Moreover, to think that majority status in statewide races establishes majority status for district contests, one would have to believe that the only factor determining voting behavior at all levels is political affiliation. That is assuredly not true. As one law review comment has put it:

---

[9] The Constitution also does not share appellants' alarm at the asserted tendency of partisan gerrymandering to create more partisan representatives. Assuming that assertion to be true, the Constitution does not answer the question whether it is better for Democratic voters to have their State's congressional delegation include 10 wishy-washy Democrats (because Democratic voters are "effectively" distributed so as to constitute bare majorities in many districts), or 5 hardcore Democrats (because Democratic voters are tightly packed in a few districts). Choosing the former "dilutes" the vote of the radical Democrat; choosing the latter does the same to the moderate. Neither Article I, §2, nor the Equal Protection Clause takes sides in this dispute.

"There is no statewide vote in this country for the House of Representatives or the state legislature. Rather, there are separate elections between separate candidates in separate districts, and that is all there is. If the districts change, the candidates change, their strengths and weaknesses change, their campaigns change, their ability to raise money changes, the issues change—everything changes. Political parties do not compete for the highest statewide vote totals or the highest mean district vote percentages: They compete for specific seats." Lowenstein & Steinberg, The Quest for Legislative Districting in the Public Interest: Elusive or Illusory, 33 UCLA L. Rev. 1, 59–60 (1985).

See also Schuck, Partisan Gerrymandering: A Political Problem Without Judicial Solution, in Political Gerrymandering and the Courts 240, 241 (B. Grofman ed. 1990).

But if we could identify a majority party, we would find it impossible to ensure that that party wins a majority of seats—unless we radically revise the States' traditional structure for elections. In any winner-take-all district system, there can be no guarantee, no matter how the district lines are drawn, that a majority of party votes statewide will produce a majority of seats for that party. The point is proved by the 2000 congressional elections in Pennsylvania, which, according to appellants' own pleadings, were conducted under a judicially drawn district map "free from partisan gerrymandering." Juris. Statement 137a. On this "neutral playing fiel[d]," the Democrats' statewide majority of the major-party vote (50.6%) translated into a minority of seats (10, versus 11 for the Republicans). *Id.*, at 133a, 137a. Whether by reason of partisan districting or not, party constituents may always wind up "packed" in some districts and "cracked" throughout others. See R. Dixon, Democratic Representation 462 (1968) ("All Districting Is 'Gerrymandering'"); Schuck, 87 Colum. L. Rev., at 1359. Consider, for

example, a legislature that draws district lines with no objectives in mind except compactness and respect for the lines of political subdivisions. Under that system, political groups that tend to cluster (as is the case with Democratic voters in cities) would be systematically affected by what might be called a "natural" packing effect. See *Bandemer*, 478 U. S., at 159 (O'CONNOR, J., concurring in judgment).

Our one-person, one-vote cases, see *Reynolds* v. *Sims*, 377 U. S. 533 (1964); *Wesberry* v. *Sanders*, 376 U. S. 1 (1964), have no bearing upon this question, neither in principle nor in practicality. Not in principle, because to say that each individual must have an equal say in the selection of representatives, and hence that a majority of individuals must have a majority say, is not at all to say that each discernible group, whether farmers or urban dwellers or political parties, must have representation equivalent to its numbers. And not in practicality, because the easily administrable standard of population equality adopted by *Wesberry* and *Reynolds* enables judges to decide whether a violation has occurred (and to remedy it) essentially on the basis of three readily determined factors—where the plaintiff lives, how many voters are in his district, and how many voters are in other districts; whereas requiring judges to decide whether a districting system will produce a statewide majority for a majority party casts them forth upon a sea of imponderables, and asks them to make determinations that not even election experts can agree upon.

For these reasons, we find appellants' proposed standards neither discernible nor manageable.

## C

For many of the same reasons, we also reject the standard suggested by Justice Powell in *Bandemer*. He agreed with the plurality that a plaintiff should show intent and effect, but believed that the ultimate inquiry ought to focus on whether district boundaries had been drawn solely for parti-

san ends to the exclusion of "all other neutral factors relevant to the fairness of redistricting." 478 U. S., at 161 (opinion concurring in part and dissenting in part); see also *id.*, at 164–165. Under that inquiry, the courts should consider numerous factors, though "[n]o one factor should be dispositive." *Id.*, at 173. The most important would be "the shapes of voting districts and adherence to established political subdivision boundaries." *Ibid.* "Other relevant considerations include the nature of the legislative procedures by which the apportionment law was adopted and legislative history reflecting contemporaneous legislative goals." *Ibid.* These factors, which "bear directly on the fairness of a redistricting plan," combined with "evidence concerning population disparities and statistics tending to show vote dilution," make out a claim of unconstitutional partisan gerrymandering. *Ibid.*

While Justice Powell rightly criticized the *Bandemer* plurality for failing to suggest a constitutionally based, judicially manageable standard, the standard proposed in his opinion also falls short of the mark. It is essentially a totality-of-the-circumstances analysis, where all conceivable factors, none of which is dispositive, are weighed with an eye to ascertaining whether the particular gerrymander has gone too far—or, in Justice Powell's terminology, whether it is not "fair." "Fairness" does not seem to us a judicially manageable standard. Fairness is compatible with noncontiguous districts, it is compatible with districts that straddle political subdivisions, and it is compatible with a party's not winning the number of seats that mirrors the proportion of its vote. Some criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking.

## IV

We turn next to consideration of the standards proposed by today's dissenters. We preface it with the observation that the mere fact that these four dissenters come up with three different standards—all of them different from the two proposed in *Bandemer* and the one proposed here by appellants—goes a long way to establishing that there is no constitutionally discernible standard.

### A

JUSTICE STEVENS concurs in the judgment that we should not address plaintiffs' statewide political gerrymandering challenges. Though he reaches that result via standing analysis, *post*, at 327, 328 (dissenting opinion), while we reach it through political-question analysis, our conclusions are the same: these statewide claims are nonjusticiable.

JUSTICE STEVENS would, however, require courts to consider political gerrymandering challenges at the individual-district level. Much of his dissent is addressed to the incompatibility of severe partisan gerrymanders with democratic principles. We do not disagree with that judgment, any more than we disagree with the judgment that it would be unconstitutional for the Senate to employ, in impeachment proceedings, procedures that are incompatible with its obligation to "try" impeachments. See *Nixon* v. *United States*, 506 U. S. 224 (1993). The issue we have discussed is not whether severe partisan gerrymanders violate the Constitution, but whether it is for the courts to say when a violation has occurred, and to design a remedy. On that point, JUSTICE STEVENS's dissent is less helpful, saying, essentially, that if we can do it in the racial gerrymandering context we can do it here.

We have examined, *supra*, at 285–288, the many reasons why that is not so. Only a few of them are challenged by JUSTICE STEVENS. He says that we "mistakenly assum[e] that race cannot provide a legitimate basis for making politi-

cal judgments." *Post*, at 338.    But we do not say that race-conscious decisionmaking is always unlawful.    Race can be used, for example, as an indicator to achieve the purpose of neighborhood cohesiveness in districting.    What we have said is impermissible is "the purpose of segregating voters on the basis of race," *supra*, at 286—that is to say, racial gerrymandering for race's sake, which would be the equivalent of political gerrymandering for politics' sake.    JUSTICE STEVENS says we "er[r] in assuming that politics is 'an ordinary and lawful motive'" in districting, *post*, at 324—but all he brings forward to contest that is the argument that an *excessive* injection of politics is *un*lawful.    So it is, and so does our opinion assume.    That does not alter the reality that setting out to segregate voters by race is unlawful and hence rare, and setting out to segregate them by political affiliation is (so long as one doesn't go too far) lawful and hence ordinary.

JUSTICE STEVENS's confidence that what courts have done with racial gerrymandering can be done with political gerrymandering rests in part upon his belief that "the same standards should apply," *post*, at 335.    But in fact the standards are quite different.    A purpose to discriminate on the basis of race receives the strictest scrutiny under the Equal Protection Clause, while a similar purpose to discriminate on the basis of politics does not.    "[N]othing in our case law compels the conclusion that racial and political gerrymanders are subject to precisely the same constitutional scrutiny.    In fact, our country's long and persistent history of racial discrimination in voting—as well as our Fourteenth Amendment jurisprudence, which always has reserved the strictest scrutiny for discrimination on the basis of race—would seem to compel the opposite conclusion."    *Shaw*, 509 U. S., at 650 (citation omitted).    That quoted passage was in direct response to (and rejection of) the suggestion made by JUSTICES White and STEVENS in dissent that "a racial gerrymander of the sort alleged here is functionally equivalent to

gerrymanders for nonracial purposes, such as political gerry-
manders." *Ibid.* See also *Bush* v. *Vera*, 517 U. S. 952, 964
(1996) (plurality opinion) ("We have not subjected political
gerrymandering to strict scrutiny").

JUSTICE STEVENS relies on *First Amendment cases* to
suggest that politically discriminatory gerrymanders are
subject to strict scrutiny under the *Equal Protection
Clause.* See *post*, at 324–325. It is elementary that scru-
tiny levels are claim specific. An action that triggers a
heightened level of scrutiny for one claim may receive a very
different level of scrutiny for a different claim because the
underlying rights, and consequently constitutional harms,
are not comparable. To say that suppression of political
speech (a claimed First Amendment violation) triggers strict
scrutiny is not to say that failure to give political groups
equal representation (a claimed equal protection violation)
triggers strict scrutiny. Only an equal protection claim is
before us in the present case—perhaps for the very good
reason that a First Amendment claim, if it were sustained,
would render unlawful *all* consideration of political affiliation
in districting, just as it renders unlawful *all* consideration of
political affiliation in hiring for non-policy-level government
jobs. What cases such as *Elrod* v. *Burns*, 427 U. S. 347
(1976), require is not merely that Republicans be given a
decent share of the jobs in a Democratic administration, but
that political affiliation *be disregarded.*

Having failed to make the case for strict scrutiny of polit-
ical gerrymandering, JUSTICE STEVENS falls back on the
argument that scrutiny levels simply do not matter for pur-
poses of justiciability. He asserts that a standard imposing
a strong presumption of invalidity (strict scrutiny) is no more
discernible and manageable than a standard requiring an
evenhanded balancing of all considerations with no thumb on
the scales (ordinary scrutiny). To state this is to refute it.
As is well known, strict scrutiny readily, and almost always,
results in invalidation. Moreover, the mere fact that there

exist standards which this Court could apply—the proposition which much of JUSTICE STEVENS's opinion is devoted to establishing, see, *e. g., post,* at 321–327, 340–341—does not mean that those standards are discernible in the Constitution. This Court may not willy-nilly apply standards—even manageable standards—having no relation to constitutional harms. JUSTICE STEVENS points out, see *post,* at 327, n. 15, that *Bandemer* said differences between racial and political groups "may be relevant to the manner in which the case is adjudicated, but these differences do not justify a refusal to entertain such a case." 478 U. S., at 125. As 18 years have shown, *Bandemer* was wrong.

## B

JUSTICE SOUTER, like JUSTICE STEVENS, would restrict these plaintiffs, on the allegations before us, to district-specific political gerrymandering claims. *Post,* at 346, 353 (dissenting opinion). Unlike JUSTICE STEVENS, however, JUSTICE SOUTER recognizes that there is no existing workable standard for adjudicating such claims. He proposes a "fresh start," *post,* at 345: a newly constructed standard loosely based in form on our Title VII cases, see *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973), and complete with a five-step prima facie test sewn together from parts of, among other things, our Voting Rights Act jurisprudence, law review articles, and apportionment cases. Even if these self-styled "clues" to unconstitutionality could be manageably applied, which we doubt, there is no reason to think they would detect the constitutional crime which JUSTICE SOUTER is investigating—an "extremity of unfairness" in partisan competition. *Post,* at 344.

Under JUSTICE SOUTER's proposed standard, in order to challenge a particular district, a plaintiff must show (1) that he is a member of a "cohesive political group"; (2) "that the district of his residence . . . paid little or no heed" to traditional districting principles; (3) that there were "specific cor-

relations between the district's deviations from traditional districting principles and the distribution of the population of his group"; (4) that a hypothetical district exists which includes the plaintiff's residence, remedies the packing or cracking of the plaintiff's group, and deviates less from traditional districting principles; and (5) that "the defendants · acted intentionally to manipulate the shape of the district in order to pack or crack his group." *Post*, at 347–350. When those showings have been made, the burden would shift to the defendants to justify the district "by reference to objectives other than naked partisan advantage." *Post*, at 351.

While this five-part test seems eminently scientific, upon analysis one finds that each of the last four steps requires a quantifying judgment that is unguided and ill suited to the development of judicial standards: *How much* disregard of traditional districting principles? *How many* correlations between deviations and distribution? *How much* remedying of packing or cracking by the hypothetical district? *How many legislators* must have had the intent to pack and crack—and *how efficacious* must that intent have been (must it have been, for example, a *sine qua non* cause of the districting, or a *predominant* cause)? At step two, for example, JUSTICE SOUTER would require lower courts to assess whether mapmakers paid "little or no heed to . . . traditional districting principles." *Post*, at 348. What is a lower court to do when, as will often be the case, the district adheres to some traditional criteria but not others? JUSTICE SOUTER's only response to this question is to evade it: "It is not necessary now to say exactly how a district court would balance a good showing on one of these indices against a poor showing on another, for that sort of detail is best worked out case by case." *Post*, at 348–349. But the devil lurks precisely in such detail. The central problem is determining when political gerrymandering has gone too far. It does not solve that problem to break down the original unanswerable ques-

tion (How much political motivation and effect is too much?) into four more discrete but equally unanswerable questions.

JUSTICE SOUTER's proposal is doomed to failure for a more basic reason: No test—yea, not even a five-part test—can possibly be successful unless one knows what he is testing *for.* In the present context, the test ought to identify deprivation of that minimal degree of representation or influence to which a political group is constitutionally entitled. As we have seen, the *Bandemer* test sought (unhelpfully, but at least gamely) to specify what that minimal degree was: "[a] chance to effectively influence the political process." 478 U. S., at 133. So did the appellants' proposed test: "[the] ability to translate a majority of votes into a majority of seats." Brief for Appellants 20. JUSTICE SOUTER avoids the difficulties of those formulations by never telling us what his test is looking for, other than the utterly unhelpful "extremity of unfairness." He vaguely describes the harm he is concerned with as vote dilution, *post,* at 351, a term which usually implies some actual effect on the weight of a vote. But no element of his test looks to the effect of the gerrymander on the electoral success, the electoral opportunity, or even the political influence, of the plaintiff's group. We do not know the precise constitutional deprivation his test is designed to identify and prevent.

Even if (though it is implausible) JUSTICE SOUTER believes that the constitutional deprivation consists of merely "vote dilution," his test would not even identify *that* effect. Despite his claimed reliance on the *McDonnell Douglas* framework, JUSTICE SOUTER would allow the plaintiff no opportunity to show that the mapmakers' compliance with traditional districting factors is pretextual.[10] His reason for

---

[10] JUSTICE SOUTER would allow a State, in proving its affirmative defense, to demonstrate that the reasons given for the district's shape "were more than a mere pretext for an old-fashioned gerrymander." *Post,* at 352. But the need to establish that affirmative defense does not arise

this is never stated, but it certainly cannot be that adherence to traditional districting factors negates any possibility of intentional vote dilution. As we have explained above, packing and cracking, whether intentional or no, are quite consistent with adherence to compactness and respect for political subdivision lines. See *supra*, at 289–290. An even better example is the traditional criterion of incumbency protection. JUSTICE SOUTER has previously acknowledged it to be a traditional and constitutionally acceptable districting principle. See *Vera*, 517 U. S., at 1047–1048 (dissenting opinion). Since that is so, his test would not protect those who are packed, and often tightly so, to ensure the reelection of representatives of either party. Indeed, efforts to maximize partisan representation statewide might well begin with packing voters of the opposing party into the districts of existing incumbents of that party. By this means an incumbent is protected, a potential adversary to the districting mollified, and votes of the opposing party are diluted.

Like us, JUSTICE SOUTER acknowledges and accepts that "some intent to gain political advantage is inescapable whenever political bodies devise a district plan, and some effect results from the intent." *Post*, at 344. Thus, again like us, he recognizes that "the issue is one of how much is too much." *Ibid.* And once those premises are conceded, the only line that can be drawn must be based, as JUSTICE SOUTER again candidly admits, upon a substantive "notio[n] of fairness." *Ibid.* This is the same flabby goal that deprived Justice Powell's test of all determinacy. To be sure, JUSTICE SOUTER frames it somewhat differently: Courts must intervene, he says, when "partisan competition has reached an *extremity* of unfairness." *Ibid.* (emphasis added). We do not think the problem is solved by adding the modifier.

---

until the plaintiff has established his prima facie case. And that prima facie case fails when, under step two, the district on its face complies with traditional districting criteria.

## C

We agree with much of JUSTICE BREYER's dissenting opinion, which convincingly demonstrates that "political considerations will likely play an important, and proper, role in the drawing of district boundaries." *Post*, at 358. This places JUSTICE BREYER, like the other dissenters, in the difficult position of drawing the line between good politics and bad politics. Unlike them, he would tackle this problem at the statewide level.

The criterion JUSTICE BREYER proposes is nothing more precise than "the *unjustified* use of political factors to entrench a minority in power." *Post*, at 360 (emphasis in original). While he invokes in passing the Equal Protection Clause, it should be clear to any reader that what constitutes *unjustified* entrenchment depends on his own theory of "effective government." *Post*, at 356. While one must agree with JUSTICE BREYER's incredibly abstract starting point that our Constitution sought to create a "basically democratic" form of government, *ibid.*, that is a long and impassable distance away from the conclusion that the Judiciary may assess whether a group (somehow defined) has achieved a level of political power (somehow defined) commensurate with that to which they would be entitled absent *unjustified* political machinations (whatever that means).

JUSTICE BREYER provides no real guidance for the journey. Despite his promise to do so, *ibid.*, he never tells us what he is testing for, beyond the unhelpful "*unjustified* entrenchment." *Post*, at 360. Instead, he "set[s] forth several sets of circumstances that lay out the indicia of abuse," "along a continuum," *post*, at 365, proceeding (presumably) from the most clearly unconstitutional to the possibly unconstitutional. With regard to the first "scenario," he is willing to assert that the indicia "would be sufficient to support a claim." *Post*, at 366. This seems refreshingly categorical, until one realizes that the indicia consist not merely of the failure of the party receiving the majority of votes to acquire

a majority of seats in two successive elections, *but also* of the fact that there is no "neutral" explanation for this phenomenon. *Ibid.* But of course there *always is* a neutral explanation—if only the time-honored criterion of incumbent protection. The indicia set forth in JUSTICE BREYER's second scenario "*could* also add up to unconstitutional gerrymandering," *ibid.* (emphasis added); and for those in the third "a court *may* conclude that the map crosses the constitutional line," *post*, at 367 (emphasis added). We find none of this helpful. Each scenario suffers from at least one of the problems we have previously identified, most notably the difficulties of assessing partisan strength statewide and of ascertaining whether an entire statewide plan is motivated by political or neutral justifications, see *supra*, at 285–286, 289–290. And even at that, the last two scenarios *do not even purport to provide an answer*, presumably leaving it to each district court to determine whether, under those circumstances, "*unjustified* entrenchment" has occurred. In sum, we neither know precisely what JUSTICE BREYER is testing for, nor precisely what fails the test.

But perhaps the most surprising omission from JUSTICE BREYER's dissent, given his views on other matters, is the absence of any cost-benefit analysis. JUSTICE BREYER acknowledges that "a majority normally can work its political will," *post*, at 362, and well describes the number of actors, from statewide executive officers, to redistricting commissions, to Congress, to the People in ballot initiatives and referenda, that stand ready to make that happen. See *post*, at 362–363. He gives no instance (and we know none) of permanent frustration of majority will. But where the majority has failed to assert itself for some indeterminate period (two successive elections, if we are to believe his first scenario), JUSTICE BREYER simply assumes that "court action may prove necessary," *post*, at 364. Why so? In the real world, of course, court action that is available tends to be sought, not just where it is necessary, but where it is in the interest of the seeking party. And the vaguer the test

for availability, the more frequently interest rather than necessity will produce litigation. Is the regular insertion of the judiciary into districting, with the delay and uncertainty that brings to the political process and the partisan enmity it brings upon the courts, worth the benefit to be achieved— an accelerated (by some unknown degree) effectuation of the majority will? We think not.

## V

JUSTICE KENNEDY recognizes that we have "demonstrat[ed] the shortcomings of the other standards that have been considered to date," *post*, at 308 (opinion concurring in judgment). He acknowledges, moreover, that we "lack . . . comprehensive and neutral principles for drawing electoral boundaries," *post*, at 306–307; and that there is an "absence of rules to limit and confine judicial intervention," *post*, at 307. From these premises, one might think that JUSTICE KENNEDY would reach the conclusion that political gerrymandering claims are nonjusticiable. Instead, however, he concludes that courts should continue to adjudicate such claims because a standard *may* one day be discovered.

The first thing to be said about JUSTICE KENNEDY's disposition is that it is not legally available. The District Court in this case considered the plaintiffs' claims *justiciable* but dismissed them because the standard for unconstitutionality had not been met. It is logically impossible to affirm that dismissal without either (1) finding that the unconstitutional-districting standard applied by the District Court, or some other standard that it *should* have applied, has not been met, or (2) finding (as we have) that the claim is nonjusticiable. JUSTICE KENNEDY seeks to affirm "[b]ecause, in the case before us, we have no standard." *Post*, at 313. But it is *our* job, not the plaintiffs', to explicate the standard that makes the facts alleged by the plaintiffs adequate or inadequate to state a claim. We cannot nonsuit *them* for our failure to do so.

JUSTICE KENNEDY asserts that to declare nonjusticiability would be incautious. *Post*, at 311. Our rush to such a holding after a mere 18 years of fruitless litigation "contrasts starkly" he says, "with the more patient approach" that this Court has taken in the past. *Post*, at 310. We think not. When it has come to determining what areas fall beyond our Article III authority to adjudicate, this Court's practice, from the earliest days of the Republic to the present, has been more reminiscent of Hannibal than of Hamlet. On July 18, 1793, Secretary of State Thomas Jefferson wrote the Justices at the direction of President Washington, asking whether they might answer "questions [that] depend for their solution on the construction of our treaties, on the laws of nature and nations, and on the laws of the land," but that arise "under circumstances *which do not give a cognisance of them to the tribunals of the country.*" 3 Correspondence and Public Papers of John Jay 486–487 (H. Johnston ed. 1891) (emphasis in original). The letter specifically invited the Justices to give less than a categorical yes-or-no answer, offering to present the particular questions "from which [the Justices] will themselves strike out such as any circumstances might, in their opinion, forbid them to pronounce on." *Id.*, at 487. On August 8, 1793, the Justices responded in a categorical and decidedly "impatient" manner, saying that the giving of advisory opinions—not just advisory opinions on particular questions but *all* advisory opinions, presumably even those concerning legislation affecting the Judiciary—was beyond their power. "[T]he lines of separation drawn by the Constitution between the three departments of the government" prevented it. *Id.*, at 488. The Court rejected the more "cautious" course of not "deny[ing] all hopes of intervention," *post*, at 310, but leaving the door open to the possibility that at least *some* advisory opinions (on a theory we could not yet imagine) would not violate the separation of powers. In *Gilligan* v. *Morgan*, 413 U. S. 1, 7 (1973), a case filed after the Ohio National Guard's shooting

of students at Kent State University, the plaintiffs sought "initial judicial review and continuing surveillance by a federal court over the training, weaponry, and orders of the Guard." The Court held the suit nonjusticiable; the matter was committed to the political branches because, *inter alia,* "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Id.,* at 10. The Court did not adopt the more "cautious" course of letting the lower courts try their hand at regulating the military before we declared it impossible. Most recently, in *Nixon* v. *United States,* the Court, *joined* by JUSTICE KENNEDY, held that a claim that the Senate had employed certain impermissible procedures in trying an impeachment was a nonjusticiable political question. Our decision was not limited to the particular procedures under challenge, and did not reserve the possibility that sometime, somewhere, technology or the wisdom derived from experience might make a court challenge to Senate impeachment all right.

The only cases JUSTICE KENNEDY cites in defense of his never-say-never approach are *Baker* v. *Carr* and *Bandemer.* See *post,* at 310–311. *Bandemer* provides no cover. There, all of the Justices who concluded that political gerrymandering claims are justiciable proceeded to describe what they regarded as the discernible and manageable standard that rendered it so. The lower courts were set wandering in the wilderness for 18 years not because the *Bandemer* majority thought it a good idea, but because five Justices could not agree upon a single standard, and because the standard the plurality proposed turned out not to work.

As for *Baker* v. *Carr:* It is true enough that, having had no experience *whatever* in apportionment matters of any sort, the Court there refrained from spelling out the equal protection standard. (It did so a mere two years later in *Reynolds* v. *Sims,* 377 U. S. 533 (1964).) But the judgment under review in *Baker,* unlike the one under review here, did not *demand* the determination of a standard. The lower

court in *Baker* had held the apportionment claim of the plaintiffs *nonjusticiable,* and so it was logically possible to dispose of the appeal by simply disagreeing with the nonjusticiability determination. As we observed earlier, that is not possible here, where the lower court has held the claim *justiciable* but unsupported by the facts. We must either enunciate the standard that causes us to agree or disagree with that merits judgment, or else affirm that the claim is beyond our competence to adjudicate.

JUSTICE KENNEDY worries that "[a] determination by the Court to deny all hopes of intervention could erode confidence in the courts as much as would a premature decision to intervene." *Post,* at 310. But it is the function of the courts to provide relief, not hope. What we think would erode confidence is the Court's refusal to do its job—announcing that there may well be a valid claim here, but we are not yet prepared to figure it out. Moreover, that course does more than erode confidence; by placing the district courts back in the business of pretending to afford help when they in fact can give none, it deters the political process from affording genuine relief. As was noted by a lower court confronted with a political gerrymandering claim:

> "When the Supreme Court resolves *Vieth,* it may choose to retreat from its decision that the question is justiciable, or it may offer more guidance on the nature of the required effect. . . . We have learned firsthand what will result if the Court chooses to do neither. Throughout this case we have borne witness to the powerful, conflicting forces nurtured by *Bandemer*'s holding that the judiciary is to address 'excessive' partisan line-drawing, while leaving the issue virtually unenforceable. Inevitably, as the political party in power uses district lines to lock in its present advantage, the party out of power attempts to stretch the protective cover of the Voting Rights Act, urging dilution of critical standards that may, if accepted, aid their party in the short-run but

work to the detriment of persons now protected by the Act in the long-run. Casting the appearance both that there is a wrong and that the judiciary stands ready with a remedy, *Bandemer* as applied steps on legislative incentives for self-correction." *Session*, 298 F. Supp. 2d, at 474.

But the conclusive refutation of JUSTICE KENNEDY's position is the point we first made: it is not an available disposition. We can affirm because political districting presents a nonjusticiable question; or we can affirm because we believe the correct standard which identifies unconstitutional political districting has not been met; we cannot affirm because we do not know what the correct standard is. Reduced to its essence, JUSTICE KENNEDY's opinion boils down to this: "As presently advised, I know of no discernible and manageable standard that can render this claim justiciable. I am unhappy about that, and hope that I will be able to change my opinion in the future." What are the lower courts to make of this pronouncement? We suggest that they must treat it as a reluctant fifth vote against justiciability at district and statewide levels—a vote that may change in some future case but that holds, for the time being, that this matter is nonjusticiable.

## VI

We conclude that neither Article I, § 2, nor the Equal Protection Clause, nor (what appellants only fleetingly invoke) Article I, § 4, provides a judicially enforceable limit on the political considerations that the States and Congress may take into account when districting.

Considerations of *stare decisis* do not compel us to allow *Bandemer* to stand. That case involved an interpretation of the Constitution, and the claims of *stare decisis* are at their weakest in that field, where our mistakes cannot be corrected by Congress. See *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991). They are doubly weak in *Bandemer* because the ma-

jority's inability to enunciate the judicially discernible and manageable standard that it thought existed (or did not think did not exist) presaged the need for reconsideration in light of subsequent experience. And they are triply weak because it is hard to imagine how any action taken in reliance upon *Bandemer* could conceivably be frustrated—except the bringing of lawsuits, which is not the sort of primary conduct that is relevant.

While we do not lightly overturn one of our own holdings, "when governing decisions are unworkable or are badly reasoned, 'this Court has never felt constrained to follow precedent.'" 501 U. S., at 827 (quoting *Smith* v. *Allwright,* 321 U. S. 649, 665 (1944)). Eighteen years of essentially pointless litigation have persuaded us that *Bandemer* is incapable of principled application. We would therefore overrule that case, and decline to adjudicate these political gerrymandering claims.

The judgment of the District Court is affirmed.

*It is so ordered.*

JUSTICE KENNEDY, concurring in the judgment.

A decision ordering the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process. The Court is correct to refrain from directing this substantial intrusion into the Nation's political life. While agreeing with the plurality that the complaint the appellants filed in the District Court must be dismissed, and while understanding that great caution is necessary when approaching this subject, I would not foreclose all possibility of judicial relief if some limited and precise rationale were found to correct an established violation of the Constitution in some redistricting cases.

When presented with a claim of injury from partisan gerrymandering, courts confront two obstacles. First is the lack of comprehensive and neutral principles for drawing

electoral boundaries. No substantive definition of fairness in districting seems to command general assent. Second is the absence of rules to limit and confine judicial intervention. With uncertain limits, intervening courts—even when proceeding with best intentions—would risk assuming political, not legal, responsibility for a process that often produces ill will and distrust.

That courts can grant relief in districting cases where race is involved does not answer our need for fairness principles here. Those controversies implicate a different inquiry. They involve sorting permissible classifications in the redistricting context from impermissible ones. Race is an impermissible classification. See *Shaw* v. *Reno*, 509 U. S. 630 (1993). Politics is quite a different matter. See *Gaffney* v. *Cummings*, 412 U. S. 735, 752 (1973) ("It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it").

A determination that a gerrymander violates the law must rest on something more than the conclusion that political classifications were applied. It must rest instead on a conclusion that the classifications, though generally permissible, were applied in an invidious manner or in a way unrelated to any legitimate legislative objective.

The object of districting is to establish "fair and effective representation for all citizens." *Reynolds* v. *Sims*, 377 U. S. 533, 565–568 (1964). At first it might seem that courts could determine, by the exercise of their own judgment, whether political classifications are related to this object or instead burden representational rights. The lack, however, of any agreed upon model of fair and effective representation makes this analysis difficult to pursue.

The second obstacle—the absence of rules to confine judicial intervention—is related to the first. Because there are yet no agreed upon substantive principles of fairness in districting, we have no basis on which to define clear, manage-

able, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights. Suitable standards for measuring this burden, however, are critical to our intervention. Absent sure guidance, the results from one gerrymandering case to the next would likely be disparate and inconsistent.

In this case, we have not overcome these obstacles to determining that the challenged districting violated appellants' rights. The fairness principle appellants propose is that a majority of voters in the Commonwealth should be able to elect a majority of the Commonwealth's congressional delegation. There is no authority for this precept. Even if the novelty of the proposed principle were accompanied by a convincing rationale for its adoption, there is no obvious way to draw a satisfactory standard from it for measuring an alleged burden on representational rights. The plurality demonstrates the shortcomings of the other standards that have been considered to date. See *ante,* at Parts III and IV (demonstrating that the standards proposed in *Davis* v. *Bandemer,* 478 U. S. 109 (1986), by the parties before us, and by our dissenting colleagues are either unmanageable or inconsistent with precedent, or both). I would add two comments to the plurality's analysis. The first is that the parties have not shown us, and I have not been able to discover, helpful discussions on the principles of fair districting discussed in the annals of parliamentary or legislative bodies. Our attention has not been drawn to statements of principled, well-accepted rules of fairness that should govern districting, or to helpful formulations of the legislator's duty in drawing district lines.

Second, even those criteria that might seem promising at the outset (*e. g.,* contiguity and compactness) are not altogether sound as independent judicial standards for measuring a burden on representational rights. They cannot promise political neutrality when used as the basis for relief. Instead, it seems, a decision under these standards would

unavoidably have significant political effect, whether intended or not. For example, if we were to demand that congressional districts take a particular shape, we could not assure the parties that this criterion, neutral enough on its face, would not in fact benefit one political party over another. See *Gaffney, supra,* at 753 ("District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic or predominantly Republican, or make a close race likely"); see also R. Bork, The Tempting of America: The Political Seduction of the Law 88–89 (1990) (documenting the author's service as a special master responsible for redistricting Connecticut and noting that his final plan so benefited the Democratic Party, albeit unintentionally, that the party chairman personally congratulated him); M. Altman, Modeling the Effect of Mandatory District Compactness on Partisan Gerrymanders, 17 Pol. Geography 989, 1000–1006 (1998) (explaining that compactness standards help Republicans because Democrats are more likely to live in high density regions).

The challenge in finding a manageable standard for assessing burdens on representational rights has long been recognized. See Lowenstein & Steinberg, The Quest for Legislative Districting in the Public Interest: Elusive or Illusory? 33 UCLA L. Rev. 1, 74 (1985) ("[W]hat matters to us, and what we think matters to almost all Americans when district lines are drawn, is how the fortunes of the parties and the policies the parties stand for are affected. When such things are at stake there is no neutrality. There is only political contest"). The dearth of helpful historical guidance must, in part, cause this uncertainty.

There are, then, weighty arguments for holding cases like these to be nonjusticiable; and those arguments may prevail in the long run. In my view, however, the arguments are not so compelling that they require us now to bar all future claims of injury from a partisan gerrymander. It is not in our tradition to foreclose the judicial process from the at-

tempt to define standards and remedies where it is alleged that a constitutional right is burdened or denied. Nor is it alien to the Judiciary to draw or approve election district lines. Courts, after all, already do so in many instances. A determination by the Court to deny all hopes of intervention could erode confidence in the courts as much as would a premature decision to intervene.

Our willingness to enter the political thicket of the apportionment process with respect to one-person, one-vote claims makes it particularly difficult to justify a categorical refusal to entertain claims against this other type of gerrymandering. The plurality's conclusion that absent an "easily administrable standard," *ante,* at 290, the appellants' claim must be nonjusticiable contrasts starkly with the more patient approach of *Baker* v. *Carr,* 369 U. S. 186 (1962), not to mention the controlling precedent on the question of justiciability of *Davis* v. *Bandemer, supra,* the case the plurality would overrule. See *ante,* at 305–306.

In *Baker* the Court made clear that the more abstract standards that guide analysis of all Fourteenth Amendment claims sufficed to ensure justiciability of a one-person, one-vote claim. See 369 U. S., at 226.

> "Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action." *Ibid.*

The Court said this before the more specific standard with which we are now familiar emerged to measure the burden nonequipopulous districting causes on representational rights. See *Reynolds,* 377 U. S., at 565–568 (concluding that

"[s]ince the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment," a legislature's reliance on other apportionment interests is invalid, arbitrary, and capricious action if it leads to unequal populations among districts). The plurality's response that in *Baker* this Court sat in review only of a nonjusticiability holding is wide of the mark. See *ante*, at 303–304. As the plurality itself instructs: Before a court can conclude that it "has [any] business entertaining [a] claim," it must conclude that some "judicially enforceable righ[t]" is at issue. *Ante*, at 277. Whether a manageable standard made the right at issue in *Baker* enforceable was as much a necessary inquiry there as it is here. In light of *Baker* and *Davis* v. *Bandemer*, which directly address the question of nonjusticiability in the specific context of districting and of asserted violations of the Fourteenth Amendment, the plurality's further survey of cases involving different approaches to the justiciability of different claims cannot be thought controlling. See *ante*, at 302–303.

Even putting *Baker* to the side—and so assuming that the existence of a workable standard for measuring a gerrymander's burden on representational rights distinguishes one-person, one-vote claims from partisan gerrymandering claims for justiciability purposes—I would still reject the plurality's conclusions as to nonjusticiability. Relying on the distinction between a claim having or not having a workable standard of that sort involves a difficult proof: proof of a categorical negative. That is, the different treatment of claims otherwise so alike hinges entirely on proof that no standard could exist. This is a difficult proposition to establish, for proving a negative is a challenge in any context.

That no such standard has emerged in this case should not be taken to prove that none will emerge in the future. Where important rights are involved, the impossibility of full analytical satisfaction is reason to err on the side of caution. Allegations of unconstitutional bias in apportionment are

most serious claims, for we have long believed that "the right to vote" is one of "those political processes ordinarily to be relied upon to protect minorities." *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938). If a State passed an enactment that declared "All future apportionment shall be drawn so as most to burden Party X's rights to fair and effective representation, though still in accord with one-person, one-vote principles," we would surely conclude the Constitution had been violated. If that is so, we should admit the possibility remains that a legislature might attempt to reach the same result without that express directive. This possibility suggests that in another case a standard might emerge that suitably demonstrates how an apportionment's *de facto* incorporation of partisan classifications burdens rights of fair and effective representation (and so establishes the classification is unrelated to the aims of apportionment and thus is used in an impermissible fashion).

The plurality says that 18 years, in effect, prove the negative. *Ante,* at 306 ("Eighteen years of essentially pointless litigation have persuaded us"). As JUSTICE SOUTER is correct to point out, however, during these past 18 years the lower courts could do no more than follow *Davis* v. *Bandemer,* which formulated a single, apparently insuperable standard. See *post,* at 344–345 (dissenting opinion). Moreover, by the timeline of the law 18 years is rather a short period. In addition, the rapid evolution of technologies in the apportionment field suggests yet unexplored possibilities. Computer assisted districting has become so routine and sophisticated that legislatures, experts, and courts can use databases to map electoral districts in a matter of hours, not months. See, *e. g., Larios* v. *Cox,* 305 F. Supp. 2d 1335 (ND Ga. 2004) *(per curiam).* Technology is both a threat and a promise. On the one hand, if courts refuse to entertain any claims of partisan gerrymandering, the temptation to use partisan favoritism in districting in an unconstitutional manner will grow. On the other hand, these new

technologies may produce new methods of analysis that make more evident the precise nature of the burdens gerrymanders impose on the representational rights of voters and parties. That would facilitate court efforts to identify and remedy the burdens, with judicial intervention limited by the derived standards.

If suitable standards with which to measure the burden a gerrymander imposes on representational rights did emerge, hindsight would show that the Court prematurely abandoned the field. That is a risk the Court should not take. Instead, we should adjudicate only what is in the papers before us. See *Baker*, 369 U. S., at 331 (Harlan, J., dissenting) (concluding that the malapportionment claim "should have been dismissed for 'failure to state a claim upon which relief can be granted'" because "[u]ntil it is first decided to what extent [the] right [to apportion] is limited by the Federal Constitution, and whether what [a State] has done or failed to do . . . runs afoul of any such limitation, we need not reach the issues of 'justiciability' or 'political question'").

Because, in the case before us, we have no standard by which to measure the burden appellants claim has been imposed on their representational rights, appellants cannot establish that the alleged political classifications burden those same rights. Failing to show that the alleged classifications are unrelated to the aims of apportionment, appellants' evidence at best demonstrates only that the legislature adopted political classifications. That describes no constitutional flaw, at least under the governing Fourteenth Amendment standard. See *Gaffney*, 412 U. S., at 752. As a consequence, appellants' complaint alleges no impermissible use of political classifications and so states no valid claim on which relief may be granted. It must be dismissed as a result. See Fed. Rule Civ. Proc. 12(b)(6); see also *Davis* v. *Bandemer*, 478 U. S., at 134.

The plurality thinks I resolve this case with reference to no standard, see *ante*, at 301, but that is wrong. The Four-

teenth Amendment standard governs; and there is no doubt of that. My analysis only notes that if a subsidiary standard could show how an otherwise permissible classification, as applied, burdens representational rights, we could conclude that appellants' evidence states a provable claim under the Fourteenth Amendment standard.

Though in the briefs and at argument the appellants relied on the Equal Protection Clause as the source of their substantive right and as the basis for relief, I note that the complaint in this case also alleged a violation of First Amendment rights. See Amended Complaint ¶ 48; Juris. Statement 145a. The First Amendment may be the more relevant constitutional provision in future cases that allege unconstitutional partisan gerrymandering. After all, these allegations involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views. See *Elrod* v. *Burns*, 427 U. S. 347 (1976) (plurality opinion). Under general First Amendment principles those burdens in other contexts are unconstitutional absent a compelling government interest. See *id.*, at 362. "Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." *California Democratic Party* v. *Jones*, 530 U. S. 567, 574 (2000). As these precedents show, First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views. In the context of partisan gerrymandering, that means that First Amendment concerns arise where an apportionment has the purpose and effect of burdening a group of voters' representational rights.

The plurality suggests there is no place for the First Amendment in this area. See *ante*, at 294. The implication

is that under the First Amendment any and all consideration of political interests in an apportionment would be invalid. *Ibid.* ("Only an equal protection claim is before us in the present case—perhaps for the very good reason that a First Amendment claim, if it were sustained, would render unlawful *all* consideration of political affiliation in districting"). That misrepresents the First Amendment analysis. The inquiry is not whether political classifications were used. The inquiry instead is whether political classifications were used to burden a group's representational rights. If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest. Of course, all this depends first on courts' having available a manageable standard by which to measure the effect of the apportionment and so to conclude that the State did impose a burden or restriction on the rights of a party's voters.

Where it is alleged that a gerrymander had the purpose and effect of imposing burdens on a disfavored party and its voters, the First Amendment may offer a sounder and more prudential basis for intervention than does the Equal Protection Clause. The equal protection analysis puts its emphasis on the permissibility of an enactment's classifications. This works where race is involved since classifying by race is almost never permissible. It presents a more complicated question when the inquiry is whether a generally permissible classification has been used for an impermissible purpose. That question can only be answered in the affirmative by the subsidiary showing that the classification as applied imposes unlawful burdens. The First Amendment analysis concentrates on whether the legislation burdens the representational rights of the complaining party's voters for reasons of ideology, beliefs, or political association. The analysis allows a pragmatic or functional assessment that accords some latitude to the States. See *Eu* v. *San Francisco*

*County Democratic Central Comm.*, 489 U. S. 214 (1989); *Anderson* v. *Celebrezze*, 460 U. S. 780 (1983).

Finally, I do not understand the plurality to conclude that partisan gerrymandering that disfavors one party is permissible. Indeed, the plurality seems to acknowledge it is not. See *ante*, at 292 ("We do not disagree with [the] judgment" that "partisan gerrymanders [are incompatible] with democratic principles"); *ante*, at 293 (noting that it is the case, and that the plurality opinion assumes it to be the case, that "an *excessive* injection of politics [in districting] is *un*lawful"). This is all the more reason to admit the possibility of later suits, while holding just that the parties have failed to prove, under our "well developed and familiar" standard, that these legislative classifications "reflec[t] *no* policy, but simply arbitrary and capricious action." *Baker*, 369 U. S., at 226. That said, courts must be cautious about adopting a standard that turns on whether the partisan interests in the redistricting process were excessive. Excessiveness is not easily determined. Consider these apportionment schemes: In one State, Party X controls the apportionment process and draws the lines so it captures every congressional seat. In three other States, Party Y controls the apportionment process. It is not so blatant or egregious, but proceeds by a more subtle effort, capturing less than all the seats in each State. Still, the total effect of Party Y's effort is to capture more new seats than Party X captured. Party X's gerrymander was more egregious. Party Y's gerrymander was more subtle. In my view, however, each is culpable.

*       *       *

The ordered working of our Republic, and of the democratic process, depends on a sense of decorum and restraint in all branches of government, and in the citizenry itself. Here, one has the sense that legislative restraint was abandoned. That should not be thought to serve the interests of our political order. Nor should it be thought to serve

our interest in demonstrating to the world how democracy works. Whether spoken with concern or pride, it is unfortunate that our legislators have reached the point of declaring that, when it comes to apportionment: "'We are in the business of rigging elections.'" Hoeffel, Six Incumbents Are a Week Away from Easy Election, Winston-Salem Journal, Jan. 27, 1998, p. B1 (quoting a North Carolina state senator).

Still, the Court's own responsibilities require that we refrain from intervention in this instance. The failings of the many proposed standards for measuring the burden a gerrymander imposes on representational rights make our intervention improper. If workable standards do emerge to measure these burdens, however, courts should be prepared to order relief. With these observations, I join the judgment of the Court.

JUSTICE STEVENS, dissenting.

The central question presented by this case is whether political gerrymandering claims are justiciable. Although our reasons for coming to this conclusion differ, five Members of the Court are convinced that the plurality's answer to that question is erroneous. Moreover, as is apparent from our separate writings today, we share the view that, even if these appellants are not entitled to prevail, it would be contrary to precedent and profoundly unwise to foreclose all judicial review of similar claims that might be advanced in the future. That we presently have somewhat differing views— concerning both the precedential value of some of our recent cases and the standard that should be applied in future cases—should not obscure the fact that the areas of agreement set forth in the separate opinions are of far greater significance.

The concept of equal justice under law requires the State to govern impartially. See *Romer* v. *Evans*, 517 U. S. 620, 623 (1996); *Lehr* v. *Robertson*, 463 U. S. 248, 265 (1983); *New York City Transit Authority* v. *Beazer*, 440 U. S. 568, 587

(1979). Today's plurality opinion would exempt governing officials from that duty in the context of legislative redistricting and would give license, for the first time, to partisan gerrymanders that are devoid of any rational justification. In my view, when partisanship is the legislature's sole motivation—when any pretense of neutrality is forsaken unabashedly and all traditional districting criteria are subverted for partisan advantage—the governing body cannot be said to have acted impartially.

Although we reaffirm the central holding of the Court in *Davis* v. *Bandemer*, 478 U. S. 109 (1986), we have not reached agreement on the standard that should govern partisan gerrymandering claims. I would decide this case on a narrow ground. Plaintiffs-appellants urge us to craft new rules that in effect would authorize judicial review of statewide election results to protect the democratic process from a transient majority's abuse of its power to define voting districts. I agree with the plurality's refusal to undertake that ambitious project. *Ante*, at 284–290. I am persuaded, however, that the District Court failed to apply well-settled propositions of law when it granted the defendants' motion to dismiss plaintiff-appellant Susan Furey's gerrymandering claim.

According to the complaint, Furey is a registered Democrat who resides at an address in Montgomery County, Pennsylvania, that was located under the 1992 districting plan in Congressional District 13.[1] Under the new plan adopted by the General Assembly in 2002, Furey's address now places her in the "non-compact" District 6.[2] Furey alleges that the new districting plan was created "solely" to effectuate the interests of Republicans,[3] and that the General Assembly relied "exclusively" on a principle of "maximum partisan advantage" when drawing the plan.[4] In my judgment, Furey's

---

[1] App. to Juris. Statement 129a.

[2] *Ibid.*

[3] *Id.*, at 142a.

[4] *Id.*, at 143a.

allegations are plainly sufficient to establish: (1) that she has standing to challenge the constitutionality of District 6; (2) that her district-specific claim is not foreclosed by the *Bandemer* plurality's rejection of a statewide claim of political gerrymandering; and (3) that she has stated a claim that, at least with respect to District 6, Pennsylvania's redistricting plan violates the equal protection principles enunciated in our voting rights cases both before and after *Bandemer.* The District Court therefore erred when it granted the defendants' motion to dismiss Furey's claim.

## I

Prior to our seminal decision in *Baker* v. *Carr,* 369 U. S. 186 (1962), a majority of this Court had heeded Justice Frankfurter's repeated warnings about the dire consequences of entering the "political thicket" of legislative districting. *Colegrove* v. *Green,* 328 U. S. 549, 556 (1946). As a result, even the most egregious gerrymanders were sheltered from judicial review.[5] It was after *Baker* that we first decided that the Constitution prohibits legislators from drawing district lines that diminish the value of individual votes in overpopulated districts. In reaching that conclu-

---

[5] In *Colegrove,* for example, the Illinois Legislature had drawn the State's district lines under the 1901 State Apportionment Act and had not reapportioned in the four ensuing decades, "despite census figures indicating great changes in the distribution of the population." 328 U. S., at 569 (Black, J., dissenting). The populations of Illinois' districts in 1945 consequently ranged from 112,000 in the least populous district to 900,000 in the most. *Ibid.* Nonetheless, the Court, per Justice Frankfurter, concluded that "due regard for the effective working of our Government revealed this issue to be of a peculiarly political nature and therefore not meet for judicial determination." *Id.,* at 552. Fewer than 20 years later, the Court, confronted with a strikingly similar set of facts—a Tennessee apportionment plan set by a 1901 statute that had remained virtually unchanged despite dramatic population growth—held, in obvious tension with *Colegrove,* that the complaint stated a justiciable cause of action. *Baker,* 369 U. S., at 192, 197–198. The Court distinguished *Colegrove* as simply "a refusal to exercise equity's powers." 369 U. S., at 235.

sion, we explained that "legislatures . . . should be bodies which are collectively responsive to the popular will," *Reynolds* v. *Sims,* 377 U. S. 533, 565 (1964), and we accordingly described "the basic aim of legislative apportionment" as "achieving . . . fair and effective representation for all citizens," *id.,* at 565–566. Consistent with that goal, we also reviewed claims that the majority had discriminated against particular groups of voters by drawing multimember districts that threatened "to minimize or cancel out the voting strength of racial or political elements of the voting population." *Fortson* v. *Dorsey,* 379 U. S. 433, 439 (1965). Such districts were "vulnerable" to constitutional challenge "if racial or political groups ha[d] been fenced out of the political process and their voting strength invidiously minimized." *Gaffney* v. *Cummings,* 412 U. S. 735, 754 (1973). See also *Whitcomb* v. *Chavis,* 403 U. S. 124, 143 (1971); *Burns* v. *Richardson,* 384 U. S. 73, 88 (1966).

Our holding in *Bandemer,* 478 U. S., at 118–127, that partisan gerrymandering claims are justiciable followed ineluctably from the central reasoning in *Baker,* 369 U. S. 186. What was true in *Baker* is no less true in this context:

> "The question here is the consistency of state action with the Federal Constitution. We have no question decided, or to be decided, by a political branch of government coequal with this Court. Nor do we risk embarrassment of our government abroad, or grave disturbance at home if we take issue with [Pennsylvania] as to the constitutionality of her action here challenged. Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply ar-

bitrary and capricious action." *Id.*, at 226 (footnote omitted).

"[T]hat the [gerrymandering] claim is submitted by a political group, rather than a racial group, does not distinguish [the cases] in terms of justiciability." *Bandemer*, 478 U. S., at 125.

At issue in this case, as the plurality states, *ante*, at 278, is *Baker*'s second test—the presence or absence of judicially manageable standards. The judicial standards applicable to gerrymandering claims are deeply rooted in decisions that long preceded *Bandemer* and have been refined in later cases. Among those well-settled principles is the understanding that a district's peculiar shape might be a symptom of an illicit purpose in the line-drawing process. Most notably, in *Gomillion* v. *Lightfoot,* 364 U. S. 339, 340 (1960), the Court invalidated an Alabama statute that altered the boundaries of the city of Tuskegee "from a square to an uncouth twenty-eight-sided figure" for the sole purpose of preventing African-Americans from voting in municipal elections. The allegations of bizarre shape and improper motive, "if proven, would abundantly [have] establish[ed] that Act 140 was not an ordinary geographic redistricting measure even within familiar abuses of gerrymandering." *Id.*, at 341. Justice Fortas' concurring opinion in *Kirkpatrick* v. *Preisler,* 394 U. S. 526, 538 (1969), which referred to gerrymandering as "the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes," also identified both shape and purpose as relevant standards. The maps attached as exhibits in *Gomillion,* 364 U. S., at 348 (Appendix to opinion of the Court), and in subsequent voting rights cases demonstrate that an "uncouth" or bizarre shape can easily identify a district designed for a single-minded, nonneutral purpose.

With purpose as the ultimate inquiry, other considerations have supplied ready standards for testing the lawfulness of a gerrymander. In his dissent in *Bandemer*, Justice Powell

explained that "the merits of a gerrymandering claim must be determined by reference to the configurations of the districts, the observance of political subdivision lines, and other criteria that have independent relevance to the fairness of redistricting." 478 U. S., at 165. Applying this three-part standard, Justice Powell first reviewed the procedures used in Indiana's redistricting process and noted that the party in power had excluded the opposition from its deliberations and had placed excessive weight on data concerning party voting trends. *Id.*, at 175–176. Second, Justice Powell pointed to the strange shape of districts that conspicuously ignored traditional districting principles. *Id.*, at 176–177. He noted the impact of such shapes on residents of the uncouth districts,[6] and he included in his opinion maps that illustrated the irregularity of the district shapes, *id.*, at 181, 183. Third and finally, Justice Powell reviewed other "substantial evidence," including contemporaneous statements and press accounts, demonstrating that the architects of the districts "were motivated solely by partisan considerations." *Id.*, at 177.

The Court has made use of all three parts of Justice Powell's standard in its recent racial gerrymandering jurisprudence. In those cases, the Court has examined claims that redistricting schemes violate the equal protection guarantee where they are "so highly irregular" on their face that they "rationally cannot be understood as anything other than an effort" to segregate voters by race, *Shaw* v. *Reno*, 509 U. S. 630, 646–647 (1993) *(Shaw I)*, or where "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines," *Miller* v. *Johnson*, 515 U. S. 900, 913 (1995). See

---

[6] "'[T]he potential for voter disillusion and nonparticipation is great,' as voters are forced to focus their political activities in artificial electoral units. Intelligent voters, regardless of party affiliation, resent this sort of political manipulation of the electorate for no public purpose." 478 U. S., at 177 (citation omitted).

also *Easley* v. *Cromartie,* 532 U. S. 234, 241 (2001); *Shaw* v. *Hunt,* 517 U. S. 899, 905 (1996) *(Shaw II)*.[7] The *Shaw* line of cases has emphasized that "reapportionment is one area in which appearances do matter," *Shaw I,* 509 U. S., at 647, and has focused both on the shape of the challenged districts and the purpose behind the line-drawing in assessing the constitutionality of majority-minority districts under the Equal Protection Clause. These decisions, like Justice Powell's opinion in *Bandemer,* have also considered the process by which the districting schemes were enacted,[8] looked to other evidence demonstrating that purely improper considerations motivated the decision,[9] and included maps illustrating outlandish district shapes.[10]

Given this clear line of precedents, I should have thought the question of justiciability in cases such as this—where a set of plaintiffs argues that a single motivation resulted in a districting scheme with discriminatory effects—to be well settled. The plurality's contrary conclusion cannot be

---

[7] The reasoning in these decisions followed not only from *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960), see *Shaw I,* 509 U. S., at 644–645 (relying on *Gomillion*), but also from Justice Powell's observation in *Davis* v. *Bandemer,* 478 U. S. 109, 173, n. 12 (1986), that "[i]n some cases, proof of grotesque district shapes may, without more, provide convincing proof of unconstitutional gerrymandering."

[8] In *Miller* v. *Johnson,* 515 U. S. 900, 917–919 (1995), the Court reviewed the procedures followed by the Georgia Legislature in responding to the Justice Department's objections to its original plan, and the part that the operator of its "reapportionment computer" played in designing the districts, to support its conclusion "that the legislature subordinated traditional districting principles to race." See also *Bush* v. *Vera,* 517 U. S. 952, 961–962 (1996) (plurality opinion) (discussing use of computer program to manipulate district lines).

[9] In *Shaw II,* 517 U. S. 899, 910 (1996), for instance, the Court considered the fact that certain reports regarding the effects of past discrimination were not before the legislature and therefore could not have played a role in the districting process.

[10] *Hunt* v. *Cromartie,* 526 U. S. 541, 554 (1999); *Bush* v. *Vera,* 517 U. S., at 986 (plurality opinion); *Miller,* 515 U. S., at 928; *Shaw I,* 509 U. S., at 659.

squared with our long history of voting rights decisions. Especially perplexing is the plurality's *ipse dixit* distinction of our racial gerrymandering cases. Notably, the plurality does not argue that the judicially manageable standards that have been used to adjudicate racial gerrymandering claims would not be equally manageable in political gerrymandering cases. Instead, its distinction of those cases rests on its view that race as a districting criterion is "much more rarely encountered" than partisanship, *ante*, at 286, and that determining whether race—"a rare and constitutionally suspect motive"—dominated a districting decision "is quite different from determining whether [such a decision] is so substantially affected by the excess of an ordinary and lawful motive as to [be] invali[d]," *ibid.* But those considerations are wholly irrelevant to the issue of justiciability.

To begin with, the plurality errs in assuming that politics is "an ordinary and lawful motive." We have squarely rejected the notion that a "purpose to discriminate on the basis of politics," *ante*, at 286, 293, is never subject to strict scrutiny. On the contrary, "political belief and association constitute the core of those activities protected by the First Amendment," *Elrod* v. *Burns*, 427 U. S. 347, 356 (1976) (plurality opinion), and discriminatory governmental decisions that burden fundamental First Amendment interests are subject to strict scrutiny, *id.*, at 363; cf. *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 94–95 (1972). Thus, unless party affiliation is an appropriate requirement for the position in question, government officials may not base a decision to hire, promote, transfer, recall, discharge, or retaliate against an employee, or to terminate a contract, on the individual's partisan affiliation or speech. See *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr*, 518 U. S. 668, 674–675 (1996); *O'Hare Truck Service, Inc.* v. *City of Northlake*, 518 U. S. 712, 716–717 (1996); *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 64–65 (1990); *Branti* v. *Finkel*, 445 U. S. 507,

519–520 (1980); *Elrod,* 427 U. S., at 355–363.[11]   It follows that political affiliation is not an appropriate standard for excluding voters from a congressional district.

The plurality argues that our patronage cases do not support the proposition that strict scrutiny should be applied in political gerrymandering cases because "[i]t is elementary that scrutiny levels are claim specific." *Ante,* at 294.   It is also elementary, however, that the level of scrutiny is relevant to the question whether there has been a constitutional violation, not the question of justiciability.[12]   The standards outlined above are discernible and judicially manageable regardless of the number of cases in which they must be applied or the level of scrutiny at which the analysis occurs.[13] Thus, the dicta from *Shaw I* and *Bush* v. *Vera,* 517 U. S. 952 (1996), on which the plurality relies, *ante,* at 293–294, are beside the point, because they speak not at all to the subject of justiciability.   And while of course a difference exists be-

---

[11] The plurality opinion seems to assume that the dissenting opinions in *Umbehr,* 518 U. S., at 686 (SCALIA, J.), and *Rutan,* 497 U. S., at 92 (SCALIA, J.), correctly state the law—namely, that "when a practice not expressly prohibited by the text of the Bill of Rights bears the endorsement of a long tradition of open, widespread, and unchallenged use that dates back to the beginning of the Republic, we have no proper basis for striking it down," *id.,* at 95.   Cf. *ante,* at 274–275 (tracing the history of political gerrymanders to the beginning of the 18th century).   But "[o]ur inquiry does not begin with the judgment of history"; "[r]ather, inquiry must commence with identification of the constitutional limitations implicated by a challenged governmental practice." *Elrod,* 427 U. S., at 354–355.

[12] It goes without saying that a claim that otherwise would trigger strict scrutiny might nonetheless be nonjusticiable.   See, *e. g., Allen* v. *Wright,* 468 U. S. 737 (1984); *DeFunis* v. *Odegaard,* 416 U. S. 312 (1974) *(per curiam).*

[13] The plurality explains that it is willing to "accep[t] a modest degree of unmanageability" where the "constitutional command . . . is clear," but not where the "constitutional obligation . . . is both dubious and severely unmanageable." *Ante,* at 286.   Not only does this statement cast doubt on the plurality's faith in our racial gerrymandering cases, but its reasoning is clearly tautological.

tween the constitutional interests protected by the First and Fourteenth Amendments, the relevant lesson of the patronage cases is that partisanship is not always as benign a consideration as the plurality appears to assume. In any event, as I understand the plurality's opinion, it seems to agree that if the State goes "too far"—if it engages in "political gerrymandering for politics' sake"—it violates the Constitution in the same way as if it undertakes "racial gerrymandering for race's sake." *Ante,* at 293. But that sort of constitutional violation cannot be touched by the courts, the plurality maintains, because the judicial obligation to intervene is "dubious." *Ante,* at 286.[14]

State action that discriminates against a political minority for the sole and unadorned purpose of maximizing the power of the majority plainly violates the decisionmaker's duty to remain impartial. See, *e. g., Lehr,* 463 U. S., at 265. Gerrymanders necessarily rest on legislators' predictions that "members of certain identifiable groups . . . will vote in the same way." *Mobile* v. *Bolden,* 446 U. S. 55, 87 (1980) (STEVENS, J., concurring in judgment). "In the line-drawing process, racial, religious, ethnic, and economic gerrymanders are all species of political gerrymanders." *Id.,* at 88. Thus, the critical issue in both racial and political gerrymandering cases is the same: whether a single nonneutral criterion controlled the districting process to such an extent that the Constitution was offended. This Court has treated that precise question as justiciable in *Gomillion* and in the *Shaw* line of cases, and today's plurality has supplied no persuasive reason

---

[14] The plurality's reluctance to recognize the justiciability of partisan gerrymanders seems driven in part by a fear that recognizing such claims will give rise to a flood of litigation. See *ante,* at 286. But the list of cases that it cites in its lengthy footnote 6, *ante,* at 280, suggests that in the two decades since *Bandemer,* there has been an average of just three or four partisan gerrymandering cases filed every year. That volume is obviously trivial when compared, for example, to the amount of litigation that followed our adoption of the "one-person, one-vote" rule. See *Reynolds* v. *Sims,* 377 U. S. 533 (1964).

for distinguishing the justiciability of partisan gerrymanders. Those cases confirm and reinforce the holding that partisan gerrymandering claims are justiciable.[15]

## II

The plurality opinion in *Bandemer* dealt with a claim that the Indiana apportionment scheme for state legislative districts discriminated against Democratic voters on a statewide basis. 478 U. S., at 127. In my judgment, the *Bandemer* Court was correct to entertain that statewide challenge, because the plaintiffs in that case alleged a group harm that affected members of their party throughout the State. In the subsequent line of racial gerrymandering cases, however, the Court shifted its focus from statewide challenges and required, as a matter of standing, that plaintiffs stating race-based equal protection claims actually reside in the districts they are challenging. See *United States* v. *Hays*, 515 U. S. 737, 745 (1995). Because *Hays* has altered the standing rules for gerrymandering claims—and because, in my view, racial and political gerrymanders are species of the same constitutional concern—the *Hays* standing rule requires dismissal of the statewide claim.[16] But that does not

---

[15] Writing for the Court in *Bandemer*, Justice White put it well: "That the characteristics of the complaining group are not immutable or that the group has not been subject to the same historical stigma may be relevant to the manner in which the case is adjudicated, but these differences do not justify a refusal to entertain such a case." 478 U. S., at 125.

[16] The cases that the plurality cites today, *ante*, at 280, n. 6, support the conclusion that it would have been wise to endorse the views expressed in Justice Powell's dissent in *Bandemer*, 478 U. S., at 161, and my concurrence in *Karcher* v. *Daggett*, 462 U. S. 725, 744 (1983). I remain convinced that our opinions correctly interpreted the law. If that standard were applied to the statewide challenge in this case, a trial of the entire case would be required. For the purpose of deciding this case, even though I dissented from our decision in *Shaw I* and remain convinced that it was incorrectly decided, I would give the *Shaw* cases *stare decisis* effect in the political gerrymandering context. Given the Court's illogical disposition of this case, however, in future cases I would feel free to reexamine the

end the matter. Challenges to specific districts, such as those considered in the *Shaw* cases, relate to a different type of "representational" harm, and those allegations necessarily must be considered on a district-by-district basis. The complaint in this case alleges injuries of both types—a group harm to Democratic voters throughout Pennsylvania and a more individualized representational injury to Furey as a resident of District 6.

In a challenge to a statewide districting plan, plaintiffs-appellants complain that they have been injured because of their membership in a particular, identifiable group. The plaintiffs-appellees in *Bandemer*, for example, alleged "that Democratic voters over the State as a whole, not Democratic voters in particular districts, ha[d] been subjected to unconstitutional discrimination." 478 U. S., at 127 (citing complaint). They specifically claimed that they were injured as members of a group because the number of Democratic representatives was not commensurate with the number of Democratic voters throughout Indiana. Much like the plaintiffs-appellees in *Bandemer*, plaintiffs-appellants in this case allege that the statewide plan will enable Republicans, who constitute about half of Pennsylvania's voters, to elect 13 or 14 members of the State's 19-person congressional delegation.[17] Under *Hays*, however, plaintiffs-appellants lack standing to challenge the districting plan on a statewide basis. 515 U. S., at 744–745.[18]

A challenge to a specific district or districts, on the other hand, alleges a different type of injury entirely—one that

---

standing issue. I surely would not suggest that a plaintiff would never have standing to litigate a statewide claim.

[17] App. to Juris. Statement 138a.

[18] As the Court explained in *Hays*, "[v]oters in [gerrymandered] districts may suffer the special representational harms [that constitutionally suspect] classifications can cause in the voting context. On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms . . . ." 515 U. S., at 745.

our recent racial gerrymandering cases have recognized as cognizable.[19] In *Shaw I* we held that "a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race." 509 U. S., at 649. After describing the pernicious consequences of race-conscious districting—even when designed to enhance the representation of the minority—and after explaining why dramatically irregular shapes "'have sufficient probative force to call for an explanation,'" *id.*, at 647 (quoting *Karcher* v. *Daggett*, 462 U. S. 725, 755 (1983) (STEVENS, J., concurring)), we described the message a misshapen district sends to elected officials:

> "When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy." *Shaw I*, 509 U. S., at 648.

Undergirding the *Shaw* cases is the premise that racial gerrymanders effect a constitutional wrong when they disrupt the representational norms that ordinarily tether elected officials to their constituencies as a whole.

"[L]egislatures," we have explained, "should be bodies which are collectively responsive to the popular will," *Reynolds*, 377 U. S., at 565, for "[l]egislators are elected by voters,

---

[19] The plurality in *Bandemer*, 478 U. S., at 127, itself acknowledged that "the focus of the equal protection inquiry" in a statewide challenge "is necessarily somewhat different from that involved in the review of individual districts."

not farms or cities or economic interests," *id.*, at 562.[20]   Gerrymanders subvert that representative norm because the winner of an election in a gerrymandered district inevitably will infer that her success is primarily attributable to the architect of the district rather than to a constituency defined by neutral principles.   The *Shaw* cases hold that this disruption of the representative process imposes a cognizable "representational har[m]."   *Hays*, 515 U. S., at 745.   Because that harm falls squarely on the voters in the district whose representative might or does misperceive the object of her fealty, the injury is cognizable only when stated by voters who reside in that particular district, see *Shaw II*, 517 U. S., at 904; otherwise the "plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve," *Hays*, 515 U. S., at 745.   See also *Bush* v. *Vera*, 517 U. S., at 957–958 (plurality opinion).

Although the complaint in this case includes a statewide challenge, plaintiff-appellant Furey states a stronger claim as a resident of the misshapen District 6.[21]   She complains not merely about the injury resulting from the probable election of a congressional delegation that does not fairly repre-

---

[20] Cf. *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 153 (2003) ("Just as troubling to a functioning democracy as classic *quid pro quo* corruption is the danger that officeholders will decide issues not on the merits or the desires of their constituencies, but according to the wishes of those who have made large financial contributions valued by the officeholder").

[21] Plaintiffs-appellants Richard and Norma Jean Vieth are registered Democrats who reside in District 16.   App. to Juris. Statement 129a. The complaint does not claim that they resided in a different district under the old districting scheme, nor does it anywhere allege, as it does on Furey's behalf, that District 16 in particular is irregularly shaped.   A glance at the appended map, *infra*, reveals that District 16 is not especially unusual in its contours.   Without more specific allegations regarding District 16, I would limit the analysis to District 6.

sent the entire State, or about the harm flowing from the probable election of a Republican to represent District 6.[22] She also alleges that the grotesque configuration of that district itself imposes a special harm on the members of the political minority residing in District 6 that directly parallels the harm recognized in *Shaw I*. Officials elected by the majority party in such a district, she claims, "are more likely to believe that their primary obligation is to represent only the members of that group, rather than the constituency as a whole."[23] This is precisely the harm that the *Shaw* cases treat as cognizable in the context of racial gerrymandering. The same treatment is warranted in this case.

The risk of representational harms identified in the *Shaw* cases is equally great, if not greater, in the context of partisan gerrymanders. *Shaw I* was borne of the concern that an official elected from a racially gerrymandered district will feel beholden only to a portion of her constituents, and that those constituents will be defined by race. 509 U. S., at 648. The parallel danger of a partisan gerrymander is that the representative will perceive that the people who put her in power are those who drew the map rather than those who cast ballots, and she will feel beholden not to a subset of her constituency, but to no part of her constituency at all.[24] The problem, simply put, is that the will of the cartographers rather than the will of the people will govern.[25] As Judge

---

[22] When her residence was located in District 13, Furey was represented by a Democrat. App. 261.

[23] App. to Juris. Statement 142a.

[24] "[A]mple evidence demonstrates that many of today's congressional representatives owe their election not to 'the People of the several states' but to the mercy of state legislatures." Note, 117 Harv. L. Rev. 1196, 1202 (2004).

[25] In this sense the partisan gerrymander is the American cousin of the English "rotten borough." In the English system, Members of Parliament were elected from geographic units that remained unchanged despite population changes wrought by the Industrial Revolution. "Because rep-

Ward recently wrote, "extreme partisan gerrymandering leads to a system in which the representatives choose their constituents, rather than vice-versa." *Session* v. *Perry,* 298 F. Supp. 2d 451, 516 (ED Tex. 2004) *(per curiam)* (concurring in part and dissenting in part).

## III

Elected officials in some sense serve two masters: the constituents who elected them and the political sponsors who support them. Their primary obligations are, of course, to the public in general, but it is neither realistic nor fair to expect them wholly to ignore the political consequences of their decisions. "It would be idle . . . to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it." *Gaffney,* 412 U. S., at 752. Political factors are common and permissible elements of the art of governing a democratic society.

But while political considerations may properly influence the decisions of our elected officials, when such decisions dis-

---

resentation was not based on population, vast inequities developed over time in the form of the so-called rotten boroughs. Old Sarum, for instance, had no human residents—only a few sheep—yet sent the same number of representatives to Parliament as Yorkshire, with nearly a million inhabitants." R. Zagarri, The Politics of Size: Representation in the United States, 1776–1850, p. 37 (1987). As a result of this system, "many insignificant places returned members, while many important towns did not," and "even in large towns the members were often elected by a tiny fraction of the population." J. Butler, The Passing of the Great Reform Bill 176 (1914). Meanwhile, "[t]he Government bribed the patron or member or both by means of distinctions and offices or by actual cash," and "[t]he patron and member bribed the electors in the same way." *Ibid.* The rotten boroughs clearly would violate our familiar one-person, one-vote rule, but they were also troubling because the representative of such a borough owed his primary loyalty to his patron and the government rather than to his constituents (if he had any). Similarly, in gerrymandered districts, instead of local groups defined by neutral criteria selecting their representatives, it is the architects of the districts who select the constituencies and, in effect, the representatives.

advantage members of a minority group—whether the minority is defined by its members' race, religion, or political affiliation—they must rest on a neutral predicate. See *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 100 (1976) ("The federal sovereign, like the States, must govern impartially"); *Bandemer,* 478 U. S., at 166 (Powell, J., dissenting). The Constitution enforces "a commitment to the law's neutrality where the rights of persons are at stake." *Romer,* 517 U. S., at 623. See also *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356, 375 (2001) (KENNEDY, J., concurring) ("States act as neutral entities, ready to take instruction and to enact laws when their citizens so demand"). Thus, the Equal Protection Clause implements a duty to govern impartially that requires, at the very least, that every decision by the sovereign serve some nonpartisan public purpose.[26]

In evaluating a claim that a governmental decision violates the Equal Protection Clause, we have long required a showing of discriminatory purpose. See *Washington* v. *Davis,*

---

[26] In the realm of federal elections, the requirement of governmental neutrality is buttressed by this Court's recognition that the Elections Clause is not "'a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints.'" *Cook* v. *Gralike,* 531 U. S. 510, 523 (2001) (quoting *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779, 833–834 (1995)). And this duty to govern impartially extends to executive and legislative officials alike. Beginning as early as its first session in 1789, Congress has passed a number of statutes designed to guarantee that Executive Branch employees neutrally carry out their duties. See *Ex parte Curtis,* 106 U. S. 371, 372–373 (1882). Some of those laws avoided the danger that "the government itself may be made to furnish indirectly the money to defray the expenses of keeping the political party in power that happens to have for the time being the control of the public patronage." *Id.,* at 375. It is "fundamental" that federal employees "are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof." *Civil Service Comm'n* v. *Letter Carriers,* 413 U. S. 548, 564–565 (1973). That expectation reflects the principle that "the impartial execution of the laws" is a "great end of Government." *Id.,* at 565.

426 U. S. 229 (1976).[27] That requirement applies with full force to districting decisions. The line that divides a racial or ethnic minority unevenly between school districts can be entirely legitimate if chosen on the basis of neutral factors— county lines, for example, or a natural boundary such as a river or major thoroughfare. But if the district lines were chosen for the purpose of limiting the number of minority students in the school, or the number of families holding unpopular religious or political views, that invidious purpose surely would invalidate the district. See *Gomillion* v. *Lightfoot*, 364 U. S., at 344–345; cf. *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687, 699–700 (1994).

Consistent with that principle, our recent racial gerrymandering cases have examined the shape of the district and the purpose of the districting body to determine whether race, above all other criteria, predominated in the line-drawing process. We began by holding in *Shaw I* that a districting scheme could be "so irrational on its face that it [could] be understood only as an effort to segregate voters into separate voting districts because of their race." 509 U. S., at 658. Then, in *Miller*, we explained that *Shaw I*'s irrational-shape test did not treat the bizarreness of a district's lines itself as a constitutional violation; rather, the irregularity of the district's contours in *Shaw I* was "persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." 515 U. S., at

---

[27] In *Washington* v. *Davis*, we referred to an earlier challenge to a New York reapportionment statute that had failed because the plaintiffs had not shown that the statute was "'the product of a state contrivance to segregate on the basis of race or place of origin.'" 426 U. S., at 240 (quoting *Wright* v. *Rockefeller*, 376 U. S. 52, 58 (1964)). We emphasized that the Court in *Wright* had been unanimous in identifying the issue as "whether the 'boundaries . . . were purposefully drawn on racial lines.'" 426 U. S., at 240 (quoting *Wright*, 376 U. S., at 67).

913.   Under the *Shaw* cases, then, the use of race as a crite-rion in redistricting is not *per se* impermissible, see *Shaw I*, 509 U. S., at 642; *Shaw II*, 517 U. S. 899, but when race is elevated to paramount status—when it is the be-all and end-all of the redistricting process—the legislature has gone too far.   "Race must not simply have been *a* motivation . . . but the *predominant* factor motivating the legislature's district-ing decision."   *Easley*, 532 U. S., at 241 (internal quotation marks and citations omitted).

Just as irrational shape can serve as an objective indicator of an impermissible legislative purpose, other objective fea-tures of a districting map can save the plan from invalidation. We have explained that "traditional districting principles," which include "compactness, contiguity, and respect for polit-ical subdivisions," are "important not because they are con-stitutionally required . . . but because they are objective fac-tors that may serve to defeat a claim that a district has been gerrymandered on racial lines."   *Shaw I*, 509 U. S., at 647 (citing *Gaffney*, 412 U. S., at 752, n. 18; *Karcher*, 462 U. S., at 755 (STEVENS, J., concurring)).   "Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a State can 'de-feat a claim that a district has been gerrymandered on racial lines.'"   *Miller*, 515 U. S., at 916 (quoting *Shaw I*, 509 U. S., at 647).

In my view, the same standards should apply to claims of political gerrymandering, for the essence of a gerrymander is the same regardless of whether the group is identified as political or racial.   Gerrymandering always involves the drawing of district boundaries to maximize the voting strength of the dominant political faction and to minimize the strength of one or more groups of opponents.   *Mobile*, 446 U. S., at 87 (STEVENS, J., concurring in judgment).   In seeking the desired result, legislators necessarily make judg-ments about the probability that the members of identifiable

groups—whether economic, religious, ethnic, or racial—will vote in a certain way. The overriding purpose of those predictions is political. See *Karcher*, 462 U. S., at 749–750 (STEVENS, J., concurring); *Mobile*, 446 U. S., at 88 (STEVENS, J., concurring in judgment).[28] It follows that the standards that enable courts to identify and redress a racial gerrymander could also perform the same function for other species of gerrymanders. See *Bandemer*, 478 U. S., at 125; *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 853 (CA7 1972) (Stevens, J., dissenting).

The racial gerrymandering cases therefore supply a judicially manageable standard for determining when partisanship, like race, has played too great of a role in the districting process. Just as race can be a factor in, but cannot dictate the outcome of, the districting process, so too can partisanship be a permissible consideration in drawing district lines, so long as it does not predominate. If, as plaintiff-appellant Furey has alleged, the predominant motive of the legislators who designed District 6, and the sole justification for its bizarre shape, was a purpose to discriminate against a political minority, that invidious purpose should invalidate the district.

The plurality reasons that the standards for evaluating racial gerrymanders are not workable in cases such as this because partisan considerations, unlike racial ones, are perfectly legitimate. *Ante*, at 285–286. Until today, however, there has not been the slightest intimation in any opinion written by any Member of this Court that a naked purpose

---

[28] I have elsewhere explained my view that race as a factor in the districting process is no different from any other political consideration. Creating a majority-minority district is no better and no worse than creating an Irish-American, or Polish-American, or Italian-American district. In all events the relevant question is whether the sovereign abrogated its obligation to govern neutrally. See *Karcher*, 462 U. S., at 753–754 (STEVENS, J., concurring); *Mobile*, 446 U. S., at 88 (STEVENS, J., concurring in judgment); *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 850–853 (CA7 1972) (Stevens, J., dissenting).

to disadvantage a political minority would provide a rational basis for drawing a district line.[29]   On the contrary, our opinions referring to political gerrymanders have consistently assumed that they were at least undesirable, and we always have indicated that political considerations are among those factors that may not dominate districting decisions.[30] Purely partisan motives are "rational" in a literal sense, but there must be a limiting principle.   "[T]he word 'rational'— for me at least—includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially."   *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 452 (1985) (STEVENS, J., concurring).   A legislature controlled by one party could not, for instance, impose special taxes on members of the minority party, or use tax revenues to pay the majority party's campaign expenses.   The rational basis for government decisions must satisfy a standard of legitimacy and

[29] The plurality's long discussion of the history of political gerrymanders is interesting, *ante*, at 274–277, but it surely is not intended to suggest that the vintage of an invidious practice—even "an American political tradition as old as the Republic," *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr*, 518 U. S. 668, 688 (1996) (SCALIA, J., dissenting)—should insulate it from constitutional review. . Compare, *e. g., Bradwell* v. *State*, 16 Wall. 130 (1873), with *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 729 (2003).   The historical discussion might be relevant if it attempted to justify political gerrymandering as an acceptable use of governmental power.   In the end, however, the plurality's defense of its position comes down to the unconvincing assertion that it lacks the juridical capacity to administer the standards the Court fashioned in its recent racial gerrymandering jurisprudence.

[30] *Bandemer*, 478 U. S. 109 (plurality opinion); *Gaffney* v. *Cummings*, 412 U. S. 735, 754 (1973); *Whitcomb* v. *Chavis*, 403 U. S. 124, 143 (1971); *Burns* v. *Richardson*, 384 U. S. 73, 88 (1966); *Fortson* v. *Dorsey*, 379 U. S. 433, 439 (1965).   Consistent with these statements, the District Court in a recent case correctly described political gerrymandering as "a purely partisan exercise" and "an abuse of power that, at its core, evinces a fundamental distrust of voters, serving the self-interest of the political parties at the expense of the public good."   App. to Juris. Statement in *Balderas* v. *Texas*, O. T. 2001, No. 01–1196, p. 10.

neutrality; an acceptable rational basis can be neither purely personal nor purely partisan. See *id.*, at 452–453.

The Constitution does not, of course, require proportional representation of racial, ethnic, or political groups. In that I agree with the plurality. *Ante*, at 288. We have held, however, that proportional representation of political groups is a permissible objective, *Gaffney*, 412 U. S., at 754, and some of us have expressed the opinion that a majority's decision to enhance the representation of a racial minority is equally permissible, particularly when the decision is designed to comply with the Voting Rights Act of 1965.[31] Thus, the view that the plurality implicitly embraces today— that a gerrymander contrived for the sole purpose of disadvantaging a political minority is less objectionable than one seeking to benefit a racial minority—is doubly flawed. It disregards the obvious distinction between an invidious and a benign purpose, and it mistakenly assumes that race cannot provide a legitimate basis for making political judgments.[32]

---

[31] See *Shaw II*, 517 U. S., at 918 (STEVENS, J., dissenting); *Bush* v. *Vera*, 517 U. S., at 1033–1034 (STEVENS, J., dissenting); *Miller*, 515 U. S., at 947–948 (GINSBURG, J., dissenting).

[32] Because race so seldom provides a rational basis for a governmental decision, racial classifications almost always fail to survive "rational basis" scrutiny. But "[n]ot every decision influenced by race is equally objectionable." *Grutter* v. *Bollinger*, 539 U. S. 306, 327 (2003). When race is used as the basis for making predictive political judgments, it may be as reliable (or unreliable) as other group characteristics, such as political affiliation, economic status, or national origin. The fact that race is an immutable characteristic does not mean that there is anything immutable or certain about the political behavior of the members of any racial class. See *Mobile* v. *Bolden*, 446 U. S. 55, 88 (1980) (STEVENS, J., concurring in judgment). Registered Republicans of all races sometimes vote for Democratic candidates, and vice versa.

The plurality asserts that a person's politics, unlike her race, is not readily "discernible." *Ante*, at 287. But that assertion is belied by the evidence that the architects of political gerrymanders seem to have no difficulty in discerning the voters' political affiliation. After all, eligibility to vote in primary elections often requires the citizen to register her party affiliation, but it never requires her to register her race.

In sum, in evaluating a challenge to a specific district, I would apply the standard set forth in the *Shaw* cases and ask whether the legislature allowed partisan considerations to dominate and control the lines drawn, forsaking all neutral principles.[33] Under my analysis, if no neutral criterion can be identified to justify the lines drawn, and if the only possible explanation for a district's bizarre shape is a naked desire to increase partisan strength, then no rational basis exists to save the district from an equal protection challenge. Such a narrow test would cover only a few meritorious claims, but it would preclude extreme abuses, such as those disclosed by the record in *Badham* v. *Eu*, 694 F. Supp. 664 (ND Cal. 1988), summarily aff'd, 488 U. S. 1024 (1989),[34] and it would perhaps shorten the time period in which the pernicious effects of such a gerrymander are felt. This test would mitigate the current trend under which partisan considerations are becoming the be-all and end-all in apportioning representatives.

## IV

Plaintiff-appellant Furey plainly has stated a claim that District 6 constitutes an unconstitutional partisan gerrymander. According to the complaint, Pennsylvania's 2002 redistricting plan splits "Montgomery County alone . . . into six

---

[33] The one-person, one-vote rule obviously constitutes a neutral districting criterion, but our gerrymandering cases have never cited that principle as one of the traditional criteria "that may serve to defeat a claim that a district has been gerrymandered on racial lines." *Shaw I*, 509 U. S., at 647. Thus, I would require that a district be justified with reference to both the one-person, one-vote rule and some other neutral criterion. See *Bandemer*, 478 U. S., at 162, 168 (Powell, J., concurring in part and dissenting in part).

[34] The California districting scheme at issue in *Badham* featured a large number of districts with highly irregular shapes, all designed, the plaintiffs-appellants alleged, to dilute Republican voting strength throughout the State. See Juris. Statement in *Badham* v. *Eu*, O. T. 1987, No. 87–1818, Exh. D, p. 77a. Three Members of this Court dissented from the summary affirmance in *Badham* and would have noted probable jurisdiction. 488 U. S. 1024 (1989).

340

different congressional districts."[35]   The new District 6 "looms like a dragon descending on Philadelphia from the west, splitting up towns and communities throughout Montgomery and Berks Counties."[36]   Furey alleges that the districting plan was created "solely to effectuate the interests" of Republicans,[37] and that the General Assembly relied "exclusively on a principle of maximum partisan advantage" when drawing the plan,[38] "to the exclusion of all other criteria."[39]   The 2002 plan "is so irregular on its face that it rationally can be viewed only as an effort . . . to advance the interests of one political party, without regard for traditional redistricting principles and without any legitimate or compelling justification."[40]   "The problem," Furey claims, is that the legislature "subordinated—indeed ignored—all traditional redistricting principles and all legitimate bases for governmental decisionmaking, in order to favor those with one political viewpoint over another."[41]   The plan "ignores all other traditional redistricting criteria," she alleges, "thus demonstrating that partisanship—and nothing else—was the rationale behind the plan."[42]   Because this complaint states a claim under a judicially manageable standard for adjudicating partisan gerrymandering cases, I would reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.

The plurality candidly acknowledges that legislatures can fashion standards to remedy political gerrymandering that are perfectly manageable and, indeed, that the legislatures in Iowa and elsewhere have done so.   *Ante*, at 277, n. 4.   If

---

[35] App. to Juris. Statement 135a.

[36] *Id.*, at 136a.

[37] *Id.*, at 142a.

[38] *Id.*, at 143a.

[39] *Id.*, at 140a.

[40] *Id.*, at 143a.

[41] *Ibid.*

[42] *Id.*, at 135a.

a violation of the Constitution is found, a court could impose a remedy patterned after such a statute. Thus, the problem, in the plurality's view, is not that there is no judicially manageable standard to fix an unconstitutional partisan gerrymander, but rather that the Judiciary lacks the ability to determine when a state legislature has violated its duty to govern impartially.

Quite obviously, however, several standards for identifying impermissible partisan influence are available to judges who have the will to enforce them. We could hold that every district boundary must have a neutral justification; we could apply Justice Powell's three-factor approach in *Bandemer;* we could apply the predominant motivation standard fashioned by the Court in its racial gerrymandering cases; or we could endorse either of the approaches advocated today by JUSTICE SOUTER and JUSTICE BREYER. What is clear is that it is not the unavailability of judicially manageable standards that drives today's decision. It is, instead, a failure of judicial will to condemn even the most blatant violations of a state legislature's fundamental duty to govern impartially.

Accordingly, I respectfully dissent.

[Appendix to opinion of STEVENS, J., follows this page.]

APPENDIX TO OPINION OF STEVENS, J.

# U. S. Congressional Districts – Act 34

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, dissenting.

The Constitution guarantees both formal and substantial equality among voters. For 40 years, we have recognized that lines dividing a State into voting districts must produce divisions with equal populations: one person, one vote. *Reynolds* v. *Sims*, 377 U. S. 533, 568 (1964). Otherwise, a vote in a less populous district than others carries more clout.

Creating unequally populous districts is not, however, the only way to skew political results by setting district lines. The choice to draw a district line one way, not another, always carries some consequence for politics, save in a mythical State with voters of every political identity distributed in an absolutely gray uniformity. The spectrum of opportunity runs from cracking a group into impotent fractions, to packing its members into one district for the sake of marginalizing them in another. However equal districts may be in population as a formal matter, the consequence of a vote cast can be minimized or maximized, *Karcher* v. *Daggett*, 462 U. S. 725, 734, n. 6 (1983), and if unfairness is sufficiently demonstrable, the guarantee of equal protection condemns it as a denial of substantial equality. *Davis* v. *Bandemer*, 478 U. S. 109, 129–134 (1986) (plurality opinion).

I

The notion of fairness assumed to be denied in these cases has been described as "each political group in a State [having] the same chance to elect representatives of its choice as any other political group," *id.*, at 124, and as a "right to 'fair and effective representation,'" *id.*, at 162 (Powell, J., concurring in part and dissenting in part). Cf. *Wells* v. *Rockefeller*, 394 U. S. 542, 551 (1969) (Harlan, J., dissenting) (describing the need for "a structure which will in fact as well as theory be responsive to the sentiments of the community"). It is undeniable that political sophisticates understand such

fairness and how to go about destroying it, see App. to Juris. Statement 134a, although it cannot possibly be described with the hard edge of one person, one vote. The difficulty has been to translate these notions of fairness into workable criteria, as distinct from mere opportunities for reviewing courts to make episodic judgments that things have gone too far, the sources of difficulty being in the facts that some intent to gain political advantage is inescapable whenever political bodies devise a district plan, and some effect results from the intent. *Wells, supra,* at 554–555 (White, J., dissenting) ("In reality, of course, districting is itself a gerrymandering in the sense that it represents a complex blend of political, economic, regional, and historical considerations"). Thus, the issue is one of how much is too much, and we can be no more exact in stating a verbal test for too much partisanship than we can be in defining too much race consciousness when some is inevitable and legitimate. See *Bush* v. *Vera,* 517 U. S. 952, 1057–1062 (1996) (SOUTER, J., dissenting). Instead of coming up with a verbal formula for too much, then, the Court's job must be to identify clues, as objective as we can make them, indicating that partisan competition has reached an extremity of unfairness.

The plurality says, in effect, that courts have been trying to devise practical criteria for political gerrymandering for nearly 20 years, without being any closer to something workable than we were when *Davis* was decided. *Ante,* at 281.[1] While this is true enough, I do not accept it as sound counsel of despair. For I take it that the principal reason we have not gone from theoretical justiciability to practical administrability in political gerrymandering cases is the *Davis* plurality's specification that any criterion of forbidden gerrymandering must require a showing that members of the plaintiff's group had "essentially been shut out of the political process," 478 U. S., at 139. See, *e. g., Badham* v. *Eu,* 694

---

[1] And the plurality says the dissenters labor still in vain today, *ante,* at 292; I join in JUSTICE BREYER's response, *post,* at 368.

F. Supp. 664, 670–671 (ND Cal. 1988) (three-judge court). That is, in order to avoid a threshold for relief so low that almost any electoral defeat (let alone failure to achieve proportionate results) would support a gerrymandering claim, the *Davis* plurality required a demonstration of such pervasive devaluation over such a period of time as to raise real doubt that a case could ever be made out. *Davis* suggested that plaintiffs might need to show even that their efforts to deliberate, register, and vote had been impeded. 478 U. S., at 133. This standard, which it is difficult to imagine a major party meeting, combined a very demanding burden with significant vagueness; and if appellants have not been able to propose a practical test for a *Davis* violation, the fault belongs less to them than to our predecessors. As Judge Higginbotham recently put it, "[i]t is now painfully clear that Justice Powell's concern that *[Davis]* offered a '"constitutional green light" to would-be gerrymanderers' has been realized." *Session* v. *Perry*, 298 F. Supp. 2d 451, 474 (ED Tex. 2004) *(per curiam)* (footnote omitted) (quoting *Davis, supra,* at 173 (Powell, J., concurring in part and dissenting in part)).

## II

Since this Court has created the problem no one else has been able to solve, it is up to us to make a fresh start. There are a good many voices saying it is high time that we did, for in the years since *Davis,* the increasing efficiency of partisan redistricting has damaged the democratic process to a degree that our predecessors only began to imagine. *E. g.,* Issacharoff, Gerrymandering and Political Cartels, 116 Harv. L. Rev. 593, 624 (2002) (The "pattern of incumbent entrenchment has gotten worse as the computer technology for more exquisite gerrymandering has improved"); Karlan, The Fire Next Time: Reapportionment After the 2000 Census, 50 Stan. L. Rev. 731, 736 (1998) ("Finer-grained census data, better predictive methods, and more powerful computers allow for increasingly sophisticated equipopulous gerryman-

ders"); Pildes, Principled Limitations on Racial and Partisan Redistricting, 106 Yale L. J. 2505, 2553–2554 (1997) ("Recent cases now document in microscopic detail the astonishing precision with which redistricters can carve up individual precincts and distribute them between districts with confidence concerning the racial and partisan consequences"). See also Morrill, A Geographer's Perspective, in Political Gerrymandering and the Courts 213–214 (B. Grofman ed. 1990) (noting that gerrymandering can produce "high proportions of very safe seats"); Brief for Bernard Grofman et al. as *Amici Curiae* 5–8 (decline of competitive seats). Cf. *Wells*, 394 U. S., at 551 (Harlan, J., dissenting) ("A computer may grind out district lines which can totally frustrate the popular will on an overwhelming number of critical issues").

I would therefore preserve *Davis*'s holding that political gerrymandering is a justiciable issue, but otherwise start anew. I would adopt a political gerrymandering test analogous to the summary judgment standard crafted in *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973), calling for a plaintiff to satisfy elements of a prima facie cause of action, at which point the State would have the opportunity not only to rebut the evidence supporting the plaintiff's case, but to offer an affirmative justification for the districting choices, even assuming the proof of the plaintiff's allegations. My own judgment is that we would have better luck at devising a workable prima facie case if we concentrated as much as possible on suspect characteristics of individual districts instead of statewide patterns. It is not that a statewide view of districting is somehow less important; the usual point of gerrymandering, after all, is to control the greatest number of seats overall. But, as will be seen, we would be able to call more readily on some existing law when we defined what is suspect at the district level, and for now I would conceive of a statewide challenge as itself a function of claims that individual districts are illegitimately drawn. Finally, in the same interest of threshold simplicity, I would stick to prob-

lems of single-member districts; if we could not devise a workable scheme for dealing with claims about these, we would have to forget the complications posed by multimember districts.

### III

### A

For a claim based on a specific single-member district, I would require the plaintiff to make out a prima facie case with five elements. First, the resident plaintiff would identify a cohesive political group to which he belonged, which would normally be a major party, as in this case and in *Davis*. There is no reason in principle, however, to rule out a claimant from a minor political party (which might, if it showed strength, become the target of vigorous hostility from one or both major parties in a State) or from a different but politically coherent group whose members engaged in bloc voting, as a large labor union might do. The point is that it must make sense to speak of a candidate of the group's choice, easy to do in the case of a large or small political party, though more difficult when the organization is not defined by politics as such.[2]

Second, a plaintiff would need to show that the district of his residence, see *United States* v. *Hays*, 515 U. S. 737 (1995) (requiring residence in a challenged district for standing),

---

[2] The plurality says it would not be easy to define such a group, because "a person's politics is rarely as readily discernible—and *never* as permanently discernible—as a person's race," *ante*, at 287. But anytime political gerrymandering has been shown to occur, evidence must at least imply that the defendants themselves sat down, identified the relevant groups, and set out to concentrate the vote of one and dilute that of the others. If a plaintiff has the evidence, a court can figure out what was going on. In major-party cases I do not see any problem with permitting a plaintiff to allege that he is a registered Republican, for example, and that the state legislature set out through gerrymandering to minimize the number of Republicans elected. If references to registration will not serve, a plaintiff will need to show the criteria for partisan affiliation employed by the defendants in the challenged districting process.

paid little or no heed to those traditional districting principles whose disregard can be shown straightforwardly: contiguity, compactness, respect for political subdivisions, and conformity with geographic features like rivers and mountains. Because such considerations are already relevant to justifying small deviations from absolute population equality, *Karcher*, 462 U. S., at 740, and because compactness in particular is relevant to demonstrating possible majority-minority districts under the Voting Rights Act of 1965, *Johnson* v. *De Grandy*, 512 U. S. 997, 1008 (1994), there is no doubt that a test relying on these standards would fall within judicial competence.

Indeed, although compactness is at first blush the least likely of these principles to yield precision, it can be measured quantitatively in terms of dispersion, perimeter, and population ratios, and the development of standards would thus be possible. See generally Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After *Shaw* v. *Reno*, 92 Mich. L. Rev. 483 (1993); see also *Bush* v. *Vera*, 517 U. S., at 1057 (SOUTER, J., dissenting) (suggesting that such measuring formulas might have been applied to salvage *Shaw* v. *Reno*, 509 U. S. 630 (1993)).[3] It is not necessary now to say exactly

---

[3] Those measures, as defined by Professors Pildes and Niemi, include *dispersion*, the ratio of the area of the district to the area of the smallest circle that circumscribes the district, 92 Mich. L. Rev., at 554–555; *perimeter*, the ratio of the area of the district to the area of the circle whose diameter equals the length of the area's perimeter, *id.*, at 555–556; and *population*, the ratio of the district's population to the population contained by the minimum convex figure that encloses the district (or "rubber-band" area), *id.*, at 556–557, and n. 206. The population measure can also be taken using the district's circumscribing circle in the denominator. *Id.,* at 557. See also Polsby & Popper, The Third Criterion: Compactness as a Procedural Safeguard Against Partisan Gerrymandering, 9 Yale L. & Pol'y Rev. 301, 339–351 (1991) (discussing quantitative measures of compactness, and favoring the perimeter measure as superior for anti-gerrymandering purposes); Schwartzberg, Reapportionment, Gerrymanders, and the Notion of "Compactness," 50 Minn. L. Rev. 443 (1966) (dis-

how a district court would balance a good showing on one of these indices against a poor showing on another, for that sort of detail is best worked out case by case.

Third, the plaintiff would need to establish specific correlations between the district's deviations from traditional districting principles and the distribution of the population of his group. For example, one of the districts to which appellants object most strongly in this case is District 6, which they say "looms like a dragon descending on Philadelphia from the west, splitting up towns and communities throughout Montgomery and Berks Counties." App. to Juris. Statement 136a. To make their claim stick, they would need to point to specific protuberances on the Draconian shape that reach out to include Democrats, or fissures in it that squirm away from Republicans. They would need to show that when towns and communities were split, Democrats tended to fall on one side and Republicans on the other. Although some counterexamples would no doubt be present in any complex plan, the plaintiff's showing as a whole would need to provide reasonable support for, if not compel, an inference that the district took the shape it did because of the distribution of the plaintiff's group. That would begin, but not complete, the plaintiff's case that the defendant had chosen either to pack the group (drawn a district in order to include a uselessly high number of the group) or to crack it (drawn it so as to include fatally few), the ordinary methods of vote dilution in single-member district systems. *Ante,* at 286, n. 7.

Fourth, a plaintiff would need to present the court with a hypothetical district including his residence, one in which the proportion of the plaintiff's group was lower (in a packing claim) or higher (in a cracking one) and which at the same time deviated less from traditional districting principles than the actual district. Cf. *Thornburg* v. *Gingles,* 478 U. S. 30,

cussing proposed legislation that would have applied a variant of the perimeter measure).

50 (1986) (requiring a similar showing to demonstrate that a multimember district is "responsible for minority voters' inability to elect [their preferred] candidates"). This hypothetical district would allow the plaintiff to claim credibly that the deviations from traditional districting principles were not only correlated with, but also caused by, the packing or cracking of his group. Drawing the hypothetical district would, of course, necessarily involve redrawing at least one contiguous district,[4] and a plaintiff would have to show that this could be done subject to traditional districting principles without packing or cracking his group (or another) worse than in the district being challenged.

Fifth, and finally, the plaintiff would have to show that the defendants acted intentionally to manipulate the shape of the district in order to pack or crack his group. See *Washington* v. *Davis*, 426 U. S. 229 (1976). In substantiating claims of political gerrymandering under a plan devised by a single major party, proving intent should not be hard, once the third and fourth (correlation and cause) elements are established, politicians not being politically disinterested or characteristically naive. *Davis* v. *Bandemer*, 478 U. S., at 128 ("[W]e think it most likely that whenever a legislature redistricts, those responsible for the legislation will know the likely political composition of the new districts"). I would, however, treat any showing of intent in a major-party case as too equivocal to count unless the entire legislature were controlled by the governor's party (or the dominant legislative party were vetoproof).[5]

---

[4] It would not necessarily involve redrawing other noncontiguous districts, and I would not permit a plaintiff to ask for such a remedy unless he first made out a prima facie case as to multiple districts. See *infra*, at 353.

[5] *Amici* JoAnn Erfer et al. suggest that a political party strong enough to redistrict without the other's approval is analogous to a firm that exercises monopolistic control over a market, and that the ability to exercise such unilateral control should therefore trigger "heightened constitutional scrutiny." Brief 18–19 (citing *Terry* v. *Adams*, 345 U. S. 461 (1953), the Texas Jaybird primary case). See also Issacharoff, Gerrymandering and

If the affected group were not a major party, proof of intent could, admittedly, be difficult. It would be possible that a legislature might not even have had the plaintiff's group in mind, and a plaintiff would naturally have a hard time showing requisite intent behind a plan produced by a bipartisan commission.

## B

A plaintiff who got this far would have shown that his State intentionally acted to dilute his vote, having ignored reasonable alternatives consistent with traditional districting principles. I would then shift the burden to the defendants to justify their decision by reference to objectives other than naked partisan advantage. They might show by rebuttal evidence that districting objectives could not be served by the plaintiff's hypothetical district better than by the district as drawn, or they might affirmatively establish legitimate objectives better served by the lines drawn than by the plaintiff's hypothetical.

The State might, for example, posit the need to avoid racial vote dilution. Cf. *Bush* v. *Vera*, 517 U. S., at 990 (O'CONNOR, J., concurring) (compliance with § 2 of the Voting Rights Act of 1965 is a compelling state interest). It might plead one person, one vote, a standard compatible with gerrymandering but in some places perhaps unattainable without some lopsided proportions. The State might adopt the object of proportional representation among its political parties through its districting process. *Gaffney* v. *Cummings*, 412 U. S. 735, 754 (1973);[6] cf. *Johnson* v. *De Grandy*, 512 U. S., at

Political Cartels, 116 Harv. L. Rev. 593 (2002); Issacharoff & Pildes, Politics as Markets: Partisan Lockups of the Democratic Process, 50 Stan. L. Rev. 643 (1998). The analogy to antitrust is an intriguing one that may prove fruitful, though I do not embrace it at this point out of caution about a wholesale conceptual transfer from economics to politics.

[6] Some commentators have criticized *Gaffney* itself for failing to account for the harm of bipartisan political gerrymandering to the political process. *E. g.*, Issacharoff, Political Cartels, *supra*, at 613 ("*Gaffney* illustrates the problem of the use of a discrimination model unmoored to any positive account of the electoral process"). *Gaffney* is settled law, and for today's

1024 (totality of the circumstances did not support finding of vote dilution where "minority groups constitute[d] effective voting majorities in a number of state Senate districts substantially proportional to their share in the population").[7]

This is not, however, the time or place for a comprehensive list of legitimate objectives a State might present. The point here is simply that the Constitution should not petrify traditional districting objectives as exclusive, and it is enough to say that the State would be required to explain itself, to demonstrate that whatever reasons it gave were more than a mere pretext for an old-fashioned gerrymander.

---

purposes I would take as given its approval of bipartisan gerrymanders, with their associated goal of incumbent protection. The plurality may be correct, *ante*, at 297–298, that the test I propose could catch more objectionable gerrymanders if we rejected incumbent protection as an acceptable purpose of districting. But I am wary of lumping all measures aimed at incumbent protection together at this point, and I think we would gain a better sense of what to do if we waited upon the experience of the district courts in assessing particular efforts at incumbency protection offered by the States in responding to prima facie cases.

[7] It is worth a moment to address the plurality's charge that any judicial remedy for political gerrymandering necessarily assumes a right to proportional representation. *Ante*, at 288 ("Deny it as appellants may (and do), [their] standard rests upon the principle that groups (or at least political-action groups) have a right to proportional representation"). I agree with this Court's earlier statements that the Constitution guarantees no right to proportional representation. See *Davis* v. *Bandemer*, 478 U. S. 109, 130 (1986) (plurality opinion) (citing *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971), and *White* v. *Regester*, 412 U. S. 755 (1973)). It does not follow that the Constitution permits every state action intended to achieve any extreme form of disproportionate representation. "Proportional representation" usually refers to a set of procedural mechanisms used to guarantee, with more or less precision, that a political party's seats in the legislature will be proportionate to its share of the vote. See generally S. Issacharoff, P. Karlan, & R. Pildes, The Law of Democracy 1089–1172 (rev. 2d ed. 2002) (discussing voting systems other than the single-member district). The Constitution requires a State to adopt neither those mechanisms nor their goal of giving a party seats proportionate to its vote.

## C

As for a statewide claim, I would not attempt an ambitious definition without the benefit of experience with individual district claims, and for now I would limit consideration of a statewide claim to one built upon a number of district-specific ones. Each successful district-specific challenge would necessarily entail redrawing at least one contiguous district, and the more the successful claims, the more surrounding districts to be redefined. At a certain point, the ripples would reach the state boundary, and it would no longer make any sense for a district court to consider the problems piecemeal.

## D

The plurality says that my proposed standard would not solve the essential problem of unworkability. It says that "[i]t does not solve [the] problem [of determining when gerrymandering has gone too far] to break down the original unanswerable question . . . into four more discrete but equally unanswerable questions." *Ante,* at 296–297. It is common sense, however, to break down a large and intractable issue into discrete fragments as a way to get a handle on the larger one, and the elements I propose are not only tractable in theory, but the very subjects that judges already deal with in practice. The plurality asks, for example, "[w]hat . . . a lower court [is] to do when, as will often be the case, the district adheres to some traditional criteria but not others?" *Ante,* at 296. This question already arises in cases under § 2 of the Voting Rights Act of 1965, and the district courts have not had the same sort of difficulty answering it as they have in applying the *Davis* v. *Bandemer* plurality. See, *e. g., Johnson* v. *Hamrick,* 155 F. Supp. 2d 1355, 1362–1363 (ND Ga. 2001) (noncontiguity of a plaintiff's *Gingles* districts was not fatal to a § 2 claim against a municipal districting scheme because "the city's boundaries are rough and asymmetrical . . . [and] the non-contiguous por-

tions [of the proposed districts] are separated by unincorporated areas and are relatively near the districts to which they are joined"). The enquiries I am proposing are not, to be sure, as hard edged as I wish they could be, but neither do they have a degree of subjectivity inconsistent with the judicial function.

The plurality also says that my standard is destined to fail because I have not given a precise enough account of the extreme unfairness I would prevent. *Ante,* at 297–298. But this objection is more the reliable expression of the plurality's own discouragement than the description of an Achilles heel in my suggestion. The harm from partisan gerrymandering is (as I have said, *supra,* at 343, 349–350) a species of vote dilution: the point of the gerrymander is to capture seats by manipulating district lines to diminish the weight of the other party's votes in elections. To devise a judicial remedy for that harm, however, it is not necessary to adopt a full-blown theory of fairness, furnishing a precise measure of harm caused by divergence from the ideal in each case. It is sufficient instead to agree that gerrymandering is, indeed, unfair, as the plurality does not dispute; to observe the traditional methods of the gerrymanderer, which the plurality summarizes, *ante,* at 274–276; and to adopt a test aimed at detecting and preventing the use of those methods, which, I think, mine is. If those methods are unnecessary to effective gerrymandering, as the plurality implies, *ante,* at 297–298, it is hard to explain why they have been so popular down through the ages of American politics. My test would no doubt leave substantial room for a party in power to seek advantage through its control of the districting process; the only way to prevent all opportunism would be to remove districting wholly from legislative control, which I am not prepared to say the Constitution requires. But that does not make it impossible for courts to identify at least the worst cases of gerrymandering, and to provide a remedy. The most the plurality can show is that my approach would

not catch them all. Cf. Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1178 (1989) ("To achieve what is, from the standpoint of the substantive policies involved, the 'perfect' answer is nice—but it is just one of a number of competing values").

## IV

In drafting the complaint for this case, appellants' counsel naturally proceeded on the assumption that they had to satisfy the *Davis* v. *Bandemer* plurality, or some revision in light of *Shaw*, but not the prima facie case I have in mind. Richard and Norma Jean Vieth make only statewide claims, for which the single district claim brought by Susan Furey provides insufficient grounding. As for Furey's own claim, her allegations fall short, for example, on the feasibility of an alternative district superior to her own, as I would require. But she might well be able to allege what I would require, if given leave to amend. I would grant her that leave, and therefore would vacate the judgment of the District Court and remand for further proceedings. From the Court's judgment denying her that opportunity, I respectfully dissent.

JUSTICE BREYER, dissenting.

The use of purely political considerations in drawing district boundaries is not a "necessary evil" that, for lack of judicially manageable standards, the Constitution inevitably must tolerate. Rather, pure politics often helps to secure constitutionally important democratic objectives. But sometimes it does not. Sometimes purely political "gerrymandering" will fail to advance any plausible democratic objective while simultaneously threatening serious democratic harm. And sometimes when that is so, courts can identify an equal protection violation and provide a remedy. Because the plaintiffs could claim (but have not yet proved) that such circumstances exist here, I would reverse the District Court's dismissal of their complaint.

The plurality focuses directly on the most difficult issue before us. It says, "[n]o test—yea, not even a five-part test—can possibly be successful unless one knows what he is testing *for.*" *Ante,* at 297 (emphasis in original). That is true. Thus, I shall describe a set of circumstances in which the use of purely political districting criteria could conflict with constitutionally mandated democratic requirements—circumstances that the courts should "test for." I shall then explain why I believe it possible to find applicable judicially manageable standards. And I shall illustrate those standards.

## I

I start with a fundamental principle. "We the People," who "ordain[ed] and establish[ed]" the American Constitution, sought to create and to protect a workable form of government that is in its "'principles, structure, and whole mass,'" basically democratic. G. Wood, The Creation of the American Republic, 1776–1787, p. 595 (1969) (quoting W. Murray, Political Sketches, Inscribed to His Excellency John Adams 5 (1787)). See also, *e. g.,* A. Meiklejohn, Free Speech and Its Relation to Self-Government 14–15 (1948). In a modern Nation of close to 300 million people, the workable democracy that the Constitution foresees must mean more than a guaranteed opportunity to elect legislators representing equally populous electoral districts. *Reynolds* v. *Sims,* 377 U. S. 533, 568 (1964); *Kirkpatrick* v. *Preisler,* 394 U. S. 526, 530–531 (1969); *Karcher* v. *Daggett,* 462 U. S. 725, 730 (1983). There must also be a method for transforming the will of the majority into effective government.

This Court has explained that political parties play a necessary role in that transformation. At a minimum, they help voters assign responsibility for current circumstances, thereby enabling those voters, through their votes for individual candidates, to express satisfaction or dissatisfaction with the political status quo. Those voters can either vote to support that status quo or vote to "throw the rascals out."

See generally *McConnell* v. *Federal Election Comm'n,* 540 U. S. 93, 188 (2003); *California Democratic Party* v. *Jones,* 530 U. S. 567, 574 (2000); *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n,* 518 U. S. 604, 615–616 (1996). A party-based political system that satisfies this minimal condition encourages democratic responsibility. It facilitates the transformation of the voters' will into a government that reflects that will.

Why do I refer to these elementary constitutional principles? Because I believe they can help courts identify at least one abuse at issue in this case. To understand how that is so, one should begin by asking why single-member electoral districts are the norm, why the Constitution does not insist that the membership of legislatures better reflect different political views held by different groups of voters. History, of course, is part of the answer, but it does not tell the entire story. The answer also lies in the fact that a single-member-district system helps to ensure certain democratic objectives better than many "more representative" (*i. e.,* proportional) electoral systems. Of course, single-member districts mean that only parties with candidates who finish "first past the post" will elect legislators. That fact means in turn that a party with a bare majority of votes or even a plurality of votes will often obtain a large legislative majority, perhaps freezing out smaller parties. But single-member districts thereby diminish the need for coalition governments. And that fact makes it easier for voters to identify which party is responsible for government decision-making (and which rascals to throw out), while simultaneously providing greater legislative stability. Cf. C. Mershon, The Costs of Coalition: Coalition Theories and Italian Governments, 90 Am. Pol. Sci. Rev. 534 (1996) (noting that from 1946 to 1992, under proportional systems "almost no [Italian] government stayed in office more than a few years, and many governments collapsed after only a few months"); Hermens, Representation and Proportional Representation,

in Choosing an Electoral System: Issues and Alternatives 15, 24 (A. Lijphart & B. Grofman eds. 1984) (describing the "political paralysis which had become the hallmark of the Fourth Republic" under proportional representation). See also Duverger, Which is the Best Electoral System? in Choosing an Electoral System, *supra*, at 31, 32 (arguing that proportional systems "preven[t] the citizens from expressing a clear choice for a governmental team," and that nonproportional systems allow voters to "choose governments with the capacity to make decisions"). This is not to say that single-member districts are preferable; it is simply to say that single-member-district systems and more-directly-representational systems reflect different conclusions about the proper balance of different elements of a workable democratic government.

If single-member districts are the norm, however, then political considerations will likely play an important, and proper, role in the drawing of district boundaries. In part, that is because politicians, unlike nonpartisan observers, normally understand how "the location and shape of districts" determine "the political complexion of the area." *Gaffney* v. *Cummings*, 412 U. S. 735, 753 (1973). It is precisely *because* politicians are best able to predict the effects of boundary changes that the districts they design usually make some political sense. See, *e. g.*, Persily, In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders, 116 Harv. L. Rev. 649, 678, and nn. 94–95 (2002) (recounting the author's experience as a neutral court-appointed boundary drawer, in which the plan he helped draw moved an uninhabited swamp from one district to another, thereby inadvertently disrupting environmental projects that were important to the politician representing the swamp's former district).

More important for present purposes, the role of political considerations reflects a surprising mathematical fact. Given a fairly large state population with a fairly large con-

gressional delegation, districts assigned so as to be perfectly random in respect to politics would translate a small shift in political sentiment, say a shift from 51% Republican to 49% Republican, into a seismic shift in the makeup of the legislative delegation, say from 100% Republican to 100% Democrat. See M. Altman, Modeling the Effect of Mandatory District Compactness on Partisan Gerrymanders, 17 Pol. Geography 989, 1002 (1998) (suggesting that, where the state population is large enough, even randomly selected compact districts will generally elect *no* politicians from the party that wins fewer votes statewide). Any such exaggeration of tiny electoral changes—virtually wiping out legislative representation of the minority party—would itself seem highly undemocratic.

Given the resulting need for single-member districts with nonrandom boundaries, it is not surprising that "traditional" districting principles have rarely, if ever, been politically neutral. Rather, because, in recent political memory, Democrats have often been concentrated in cities while Republicans have often been concentrated in suburbs and sometimes rural areas, geographically drawn boundaries have tended to "pac[k]" the former. See *ante*, at 290 (plurality opinion) (citing *Davis* v. *Bandemer*, 478 U. S. 109, 159 (1986) (O'CONNOR, J., concurring in judgment)); Lowenstein & Steinberg, The Quest for Legislative Districting in the Public Interest: Elusive or Illusory? 33 UCLA L. Rev. 1, 9 (1985) (explaining that the "'formal' criteria . . . do not live up to their advance billing as 'fair' or 'neutral'"). Neighborhood or community-based boundaries, seeking to group Irish, Jewish, or African-American voters, often did the same. All this is well known to politicians, who use their knowledge about the effects of the "neutral" criteria to partisan advantage when drawing electoral maps. And were it not so, the iron laws of mathematics would have worked their extraordinary volatility-enhancing will.

This is to say that traditional or historically based boundaries are not, and should not be, "politics free." Rather, those boundaries represent a series of compromises of principle—among the virtues of, for example, close representation of voter views, ease of identifying "government" and "opposition" parties, and stability in government. They also represent an uneasy truce, sanctioned by tradition, among different parties seeking political advantage.

As I have said, reference back to these underlying considerations helps to explain why the legislature's use of political boundary-drawing considerations ordinarily does *not* violate the Constitution's Equal Protection Clause. The reason lies not simply in the difficulty of identifying abuse or finding an appropriate judicial remedy. The reason is more fundamental: Ordinarily, there simply is no abuse. The use of purely political boundary-drawing factors, even where harmful to the members of one party, will often nonetheless find justification in other desirable democratic ends, such as maintaining relatively stable legislatures in which a minority party retains significant representation.

## II

At the same time, these considerations can help identify at least one circumstance where use of purely political boundary-drawing factors can amount to a serious, and remediable, abuse, namely, the *unjustified* use of political factors to entrench a minority in power. By entrenchment I mean a situation in which a party that enjoys only minority support among the populace has nonetheless contrived to take, and hold, legislative power. By *unjustified* entrenchment I mean that the minority's hold on power is purely the result of partisan manipulation and not other factors. These "other" factors that could lead to "justified" (albeit temporary) minority entrenchment include sheer happenstance, the existence of more than two major parties, the unique constitutional requirements of certain representational bod-

ies such as the Senate, or reliance on traditional (geographic, communities of interest, etc.) districting criteria.

The democratic harm of unjustified entrenchment is obvious. As this Court has written in respect to popularly based electoral districts:

> "Logically, in a society ostensibly grounded on representative government, it would seem reasonable that a majority of the people of a State could elect a majority of that State's legislators. To conclude differently, and to sanction minority control of state legislative bodies, would appear to deny majority rights in a way that far surpasses any possible denial of minority rights that might otherwise be thought to result. Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsive to the popular will." *Reynolds*, 377 U. S., at 565.

Where unjustified entrenchment takes place, voters find it far more difficult to remove those responsible for a government they do not want; and these democratic values are dishonored.

The need for legislative stability cannot justify entrenchment, for stability is compatible with a system in which the loss of majority support implies a loss of power. The need to secure minority representation in the legislature cannot justify entrenchment, for minority party representation is also compatible with a system in which the loss of minority support implies a loss of representation. Constitutionally specified principles of representation, such as that of two Senators per State, cannot justify entrenchment where the House of Representatives or similar state legislative body is at issue. Unless some other justification can be found in particular circumstances, political gerrymandering that so entrenches a minority party in power violates basic democratic norms and lacks countervailing justification. For this

reason, whether political gerrymandering does, or does not, violate the Constitution in other instances, gerrymandering that leads to entrenchment amounts to an abuse that violates the Constitution's Equal Protection Clause.

## III

Courts need not intervene often to prevent the kind of abuse I have described, because those harmed constitute a political majority, and a majority normally can work its political will. Where a State has improperly gerrymandered legislative or congressional districts to the majority's disadvantage, the majority should be able to elect officials in statewide races—particularly the Governor—who may help to undo the harm that districting has caused the majority's party, in the next round of districting if not sooner. And where a State has improperly gerrymandered congressional districts, Congress retains the power to revise the State's districting determinations. See U. S. Const., Art. I, § 4; *ante,* at 275–277 (plurality opinion) (discussing the history of Congress' "power to check partisan manipulation of the election process by the States").

Moreover, voters in some States, perhaps tiring of the political boundary-drawing rivalry, have found a procedural solution, confiding the task to a commission that is limited in the extent to which it may base districts on partisan concerns. According to the National Conference of State Legislatures, 12 States currently give "first and final authority for [state] legislative redistricting to a group other than the legislature." National Conference of State Legislatures, Redistricting Commissions and Alternatives to the Legislature Conducting Redistricting (2004), available at http://www.ncsl.org/programs/legman/Redistrict/Com&alter.htm (all Internet materials as visited Mar. 29, 2004, and available in Clerk of Court's case file). A number of States use a commission for congressional redistricting: Arizona, Hawaii, Idaho, Montana, New Jersey, and Washington, with Indiana

using a commission if the legislature cannot pass a plan and Iowa requiring the district-drawing body not to consider political data. *Ibid.;* Iowa General Assembly, Legislative Service Bureau, Legislative Guide to Redistricting (Dec. 2000), available at http://www.legis.state.ia.us/Central/LSB/Guides/redist.htm. Indeed, where state governments have been unwilling or unable to act, "an informed, civically militant electorate," *Baker* v. *Carr*, 369 U. S. 186, 270 (1962) (Frankfurter, J., dissenting), has occasionally taken matters into its own hands, through ballot initiatives or referendums. Arizona voters, for example, passed Proposition 106, which amended the State's Constitution and created an independent redistricting commission to draw legislative and congressional districts. Ariz. Const., Art. 4, pt. 2, § 1 (West 2001). Such reforms borrow from the systems used by other countries utilizing single-member districts. See, *e. g.,* Administration and Cost of Elections Project, Boundary Delimitation (hereinafter ACE Project), Representation in the Canadian Parliament, available at http://www.aceproject.org/main/english/bd/bdy_ca.htm (describing Canada's independent boundary commissions, which draft maps based on equality of population, communities of interest, and geographic factors); ACE Project, The United Kingdom Redistribution Process, available at http://www.aceproject.org/main/english/bd/bdy_gb.htm (describing the United Kingdom's independent boundary commissions, which make recommendations to Parliament after consultation with the public); G. Gudgin & P. Taylor, Seats, Votes, and the Spatial Organisation of Elections 8 (1979) (noting that the United Kingdom's boundary commissions are "explicitly neutral in a party political sense").

But we cannot always count on a severely gerrymandered legislature itself to find and implement a remedy. See *Bandemer*, 478 U. S., at 126. The party that controls the process has no incentive to change it. And the political advantages of a gerrymander may become ever greater in the future.

The availability of enhanced computer technology allows the parties to redraw boundaries in ways that target individual neighborhoods and homes, carving out safe but slim victory margins in the maximum number of districts, with little risk of cutting their margins too thin. See generally Handley, A Guide to 2000 Redistricting Tools and Technology, in The Real Y2K Problem: Census 2000 Data and Redistricting Technology (N. Persily ed. 2000); Karlan, The Fire Next Time: Reapportionment After the 2000 Census, 50 Stan. L. Rev. 731, 736 (1998); *ante*, at 345–346 (SOUTER, J., dissenting). By redrawing districts every 2 years, rather than every 10 years, a party might preserve its political advantages notwithstanding population shifts in the State. The combination of increasingly precise map-drawing technology and increasingly frequent map drawing means that a party may be able to bring about a gerrymander that is not only precise, but virtually impossible to dislodge. Thus, court action may prove necessary.

When it is necessary, a court should prove capable of finding an appropriate remedy. Courts have developed districting remedies in other cases. See, *e. g., Branch* v. *Smith,* 538 U. S. 254 (2003) (affirming the District Court's injunction of use of state court's redistricting plan and order that its own plan be used until a state plan could be precleared under the Voting Rights Act of 1965); *Karcher,* 462 U. S. 725 (upholding the District Court's holding that a congressional reapportionment plan was unconstitutional); *Reynolds,* 377 U. S., at 586–587 (upholding the District Court's actions in ordering into effect a reapportionment of both houses of the state legislature). See also Issacharoff, Judging Politics: The Elusive Quest for Judicial Review of Political Fairness, 71 Texas L. Rev. 1643, 1688–1690, and nn. 227–233 (1993) (reporting that, in the wake of the 1980 census, there were 13 court-ordered plans for congressional redistricting, 5 plans that the courts rejected and returned to state legislatures for redrafting, 7 court-ordered state senate plans, 8 state senate

plans rejected and sent back to the state legislatures, 6 court-ordered state house plans, and 9 state house plans sent back for further legislative action—all of which meant that, leaving aside the preclearance provisions of §5 of the Voting Rights Act of 1965, about one-third of all redistricting was done either directly by the federal courts or under courts' injunctive authority (citing cases)). Moreover, if the dangers of inadvertent political favoritism prove too great, a procedural solution, such as the use of a politically balanced boundary-drawing commission, may prove possible.

The bottom line is that courts should be able to identify the presence of one important gerrymandering evil, the unjustified entrenching in power of a political party that the voters have rejected. They should be able to separate the unjustified abuse of partisan boundary-drawing considerations to achieve that end from their more ordinary and justified use. And they should be able to design a remedy for extreme cases.

IV

I do not claim that the problem of identification and separation is easily solved, even in extreme instances. But courts can identify a number of strong indicia of abuse. The presence of actual entrenchment, while not always unjustified (being perhaps a chance occurrence), is such a sign, particularly when accompanied by the use of partisan boundary-drawing criteria in the way that JUSTICE STEVENS describes, i. e., a use that both departs from traditional criteria and cannot be explained other than by efforts to achieve partisan advantage. Below, I set forth several sets of circumstances that lay out the indicia of abuse I have in mind. The scenarios fall along a continuum: The more permanently entrenched the minority's hold on power becomes, the less evidence courts will need that the minority engaged in gerrymandering to achieve the desired result.

Consider, for example, the following sets of circumstances. First, suppose that the legislature has proceeded to redraw

boundaries in what seem to be ordinary ways, but the entrenchment harm has become obvious. *E. g.*, (a) the legislature has not redrawn district boundaries more than once within the traditional 10-year period; and (b) no radical departure from traditional districting criteria is alleged; but (c) a majority party (as measured by the votes actually cast for all candidates who identify themselves as members of that party in the relevant set of elections; *i. e.*, in congressional elections if a congressional map is being challenged) has *twice* failed to obtain a majority of the relevant legislative seats in elections; and (d) the failure cannot be explained by the existence of multiple parties or in other neutral ways. In my view, these circumstances would be sufficient to support a claim of unconstitutional entrenchment.

Second, suppose that plaintiffs could point to more serious departures from redistricting norms. *E. g.*, (a) the legislature has not redrawn district boundaries more than once within the traditional 10-year period; but (b) the boundary-drawing criteria depart radically from previous or traditional criteria; (c) the departure cannot be justified or explained other than by reference to an effort to obtain partisan political advantage; and (d) a majority party (as defined above) has once failed to obtain a majority of the relevant seats in election using the challenged map (which fact cannot be explained by the existence of multiple parties or in other neutral ways). These circumstances could also add up to unconstitutional gerrymandering.

Third, suppose that the legislature clearly departs from ordinary districting norms, but the entrenchment harm, while seriously threatened, has not yet occurred. *E. g.*, (a) the legislature has redrawn district boundaries more than once within the traditional 10-year census-related period—either, as here, at the behest of a court that struck down an initial plan as unlawful, see *Vieth* v. *Pennsylvania*, 195 F. Supp. 2d 672 (MD Pa. 2002) *(per curiam)* (finding that Pennsylvania's first redistricting plan violated the one-

person, one-vote mandate), or of its own accord; (b) the boundary-drawing criteria depart radically from previous traditional boundary-drawing criteria; (c) strong, objective, unrefuted statistical evidence demonstrates that a party with a minority of the popular vote within the State in all likelihood will obtain a majority of the seats in the relevant representative delegation; and (d) the jettisoning of traditional districting criteria cannot be justified or explained other than by reference to an effort to obtain partisan political advantage. To my mind, such circumstances could also support a claim, because the presence of midcycle redistricting, for any reason, raises a fair inference that partisan machinations played a major role in the map-drawing process. Where such an inference is accompanied by statistical evidence that entrenchment will be the likely result, a court may conclude that the map crosses the constitutional line we are describing.

The presence of these, or similar, circumstances—where the risk of entrenchment is demonstrated, where partisan considerations render the traditional district-drawing compromises irrelevant, where no justification other than party advantage can be found—seem to me extreme enough to set off a constitutional alarm. The risk of harm to basic democratic principle is serious; identification is possible; and remedies can be found.

## V

The plurality sets forth several criticisms of my approach. Some of those criticisms are overstated. Compare *ante*, at 300 ("[O]f course there *always is* a neutral explanation [of gerrymandering]—if only the time-honored criterion of incumbent protection"), with Brief for Appellants 13 (pointing to examples of efforts to gerrymander an incumbent of the opposition party out of office and elect a new member of the controlling party); compare *ante*, at 300 (complaining of "the difficulties of assessing partisan strength statewide"), with *supra*, at 366 (identifying the "majority party" simply by

adding up "the votes actually cast for all candidates who identify themselves as members of that party in the relevant set of elections").

Other criticisms involve differing judgments. Compare *ante,* at 299 (complaining about the vagueness of *unjustified* political machination, "whatever that means," and of *unjustified* entrenchment), with *supra,* at 360–361 (detailed discussion of "justified" and *Reynolds* v. *Sims*); compare *ante,* at 301 (finding costs of judicial intervention too high), with *supra,* at 364–365 (finding costs warranted to ensure majority rule).

But the plurality makes one criticism that warrants a more elaborate response. It observes "that the mere fact that these four dissenters come up with three different standards—all of them different from the two proposed in *Bandemer* and the one proposed here by appellants—goes a long way to establishing that there is no constitutionally discernible standard." *Ante,* at 292.

Does it? The dissenting opinions recommend sets of standards that differ in certain respects. Members of a majority might well seek to reconcile such differences. But dissenters might instead believe that the more thorough, specific reasoning that accompanies separate statements will stimulate further discussion. And that discussion could lead to change in the law, where, as here, one member of the majority, disagreeing with the plurality as to justiciability, remains in search of appropriate standards. See *ante,* at 311–312 (KENNEDY, J., concurring in judgment).

## VI

In the case before us, there is a strong likelihood that the plaintiffs' complaint could be amended readily to assert circumstances consistent with those I have set forth as appropriate for judicial intervention. For that reason, I would authorize the plaintiffs to proceed; and I dissent from the majority's contrary determination.